# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Case No.  1:17-cv-01191-LTB-NRN

ELLIS WILLIAMS,

    Plaintiff,

v.

UNITED/CONTINENTAL,

    Defendant.

---

## DEFENDANT UNITED AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT

---

   Pursuant to Federal Rule of Civil Procedure 56, Defendant United Airlines, Inc. ("United"), by and through its undersigned counsel, respectfully submits this Motion for Summary Judgment as to Plaintiff's four remaining claims.

## I.  INTRODUCTION

   Plaintiff Ellis Williams alleges that during his fewer than three months of employment as a United probationary pilot he experienced a hostile work environment, and his employment was terminated as a result of race and/or national origin discrimination.  In fact, United terminated Mr. Williams' employment solely because of his poor performance; specifically, his inability to pass a check ride on two separate occasions despite being provided numerous extra trainings in an effort to prepare him for the check rides.  There was nothing unlawful about United's decision; indeed, Mr. Williams agrees that "the safety of the flying public" is "100 percent" the goal and "[t]he objective is safety, safety, safety."  While Mr. Williams belatedly claimed that his inability to

successfully pass the check rides was a result of personal family issues he was having at the time, he admitted his failure and was unable to identify any evidence to support discrimination of any kind.

Mr. Williams now brings four claims:  (1) Discrimination and Retaliation based on Race and National Original under Title VII; (2) Discrimination based on Race in violation of 42 U.S.C. § 1981; (3) Discrimination and Retaliation based on Race and National Original under the Colorado Anti-Discrimination Act ("CADA"); and (4) Hostile Work Environment.[1]  However, all four claims fail as a matter of law as Mr. Williams cannot set forth any disputed issues of material fact precluding summary judgment.

First, the undisputed evidence proves that Mr. Williams' employment was terminated solely because of his inability to pass his check ride—a requirement for all United pilots.  After being provided five additional trainings over and above the standard training regime provided to his peers, Mr. Williams failed his first check ride on March 8, 2016, and failed his second check ride on March 16, 2016 (after receiving an extra warm-up session).  Notably, these check rides are Federal Aviation Administration ("FAA") events administered by FAA examiners—not by examiners working in their capacity as United employees.

Second, at his deposition, Mr. Williams conceded he can point to no examples of actual race discrimination or hostile work environment against him.  The only two examples he offered were both fully explained during the course of discovery and do not even rise to the level of

---

[1] Pursuant to the Court's Order Granting and Denying in Part United's Motion to Dismiss, Dkt. No. 53, the following claims were dismissed effective July 16, 2018:  (1) Plaintiff's Fifth Cause of Action – Breach of Contract; (2) Plaintiff's Sixth Cause of Action – Breach of the Covenant of Good Faith and Fair Dealing; and (3) Plaintiff's Seventh Cause of Action – Intentional Misrepresentation/Fraud.

inappropriate, much less discriminatory or harassing conduct.  For example, with regard to his assertion that he was once referred to as a "gentle giant," (and his implication that such isolated reference was a racist one), he could only offer the following:

> Q.  What about a gentle giant did you find to be discriminatory on the basis of your race or national origin?
>
> A.  You being large and soft, easy pushover.
>
> Q.  Okay.  How is that related to your race or national origin?
>
> A.  I don't know.

Additionally, Mr. Williams makes a ludicrous (and inaccurate) allegation that a Pilot Instructor offered him a watermelon-flavored drink because of his race.  *See* Dkt. No. 34 at ₱ 13; Statement of Fact ("SOF") ¶ 8.  Save for his contentions that such statements are automatically discriminatory on the basis of race and/or national origin, Mr. Williams failed to establish <u>any</u> evidence to support his claims outside of stating that he is Black and Antiguan.

Third, Mr. Williams failed to report any harassment or discrimination during his employment, and did not even contest the results of his failed check rides to his supervisor (also Black).  For these reasons, United respectfully requests that the Court grant summary judgment in favor of United as to all four of Plaintiff's remaining claims.

## II.   UNITED'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Plaintiff's Employment And Training At United.

1.   Mr. Williams completed an internship with United in 1996, and later, in 2015, applied to be a pilot at United.  [Ellis Williams Dep. Tr., Ex. A, at 99:23-100:12; 103:22-104:8; Dkt. No. 34 at ₱ 9.]

2.      The year prior, on June 7, 2014, Mr. Williams was piloting an aircraft for Mesa Airlines and ran it off the runway on landing.  He had "[a]bsolutely" no communications with the passengers during the landing, and only told them that they had run off the runway after it had already "come to a complete stop in the grass and mud."  Mr. Williams believes he did a good job of managing this landing.  [Williams Dep. Tr., Ex. A, at 77:1-9; 79:20-21; 80:6-9; 84:13-16; 86:3-17; 91:12-14.]

3.      During his initial meeting with United, Mr. Williams was interviewed by Captain Chris Fisher and First Officer (now Captain) Joe Cook, both African American.  [Williams Dep. Tr., Ex. A, at 111:11-112:5; 30(b)(6) Dep. Tr., Ex. B, at 50:17-21; 51:11-15; 53:13-22.]

4.      Mr. Williams was thereafter offered the position of First Officer [Ex. C (Dep. Ex. 15)], and understood that he would have to successfully complete training before flying for United. [Williams Dep. Tr., Ex. A, at 114:2-5.]

5.      An accurate representation of the training Mr. Williams received at United as a probationary pilot is shown in Exhibit D (Dep. Ex. 2).  [Williams Dep. Tr., Ex. A, at 117:1-15.] Mr. Williams' training consisted of the following:

- Nine days of basic indoctrination training:  over a period of nine days, new-hire probationary pilots are provided generic, non-fleet specific information and are introduced to United's policies and procedures.  Additionally, probationary pilots are introduced to Crew Resource Management/Threat Error Management ("CRM/TEM") skills which enable pilots to use all available resources and soft skills to enhance safety.  During this time, probationary pilots bid on both the aircraft they wish to fly and their home base, and they are introduced to mentorship opportunities from flight instructors, Air Line Pilots Association ("ALPA") members, and United staff through which guidance can be provided for any personal or professional concerns that may arise.

- Seven days of systems training: during this phase, probationary pilots are taught regarding systems operations specific to their aircraft — in Mr. Williams' case, the 319-320 Airbus — as they apply to the flight deck during normal and non-normal

operations.  This portion is designed to include a lecture portion and four lessons in a flight training device during which pilots have the opportunity to load the Flight Management and Guidance Computer ("FMGC").

■ Introduction to the procedures phase of training, and six days of procedures training: during the procedures training, flight training device periods are used to allow the probationary pilots to attain procedural proficiency in ground operations, departure, cruise, and arrival standard operating procedures, selected flight profiles, and competency in FMGC operations.  CRM/TEM training is also a major emphasis during the procedures training.

■ Five days of maneuvers training:  during this phase, the focus is to allow pilots to achieve proficiency in selected maneuvers necessary for line operations, and to achieve familiarity with non-normal procedures.  During this training, CRM/TEM skills are practiced and reinforced.  Some of the maneuvers introduced or reviewed during this training include aircraft handling characteristics, visual approaches and landings, non-precision approaches and landings, go-around/missed approaches, and single engine procedures.

■ Six days line oriented flight training ("LOFT") (two extra than most students need): the central features are line oriented simulator flights and continued CRM/TEM training.  During the simulator flights, pilots practice enroute procedures, flight operations procedures, performance, and the application of systems knowledge. All decisions are made and the simulator is flown as if the pilots were operating a flight on the line with passengers;

■ A total of four warm-up sessions; and

■ Two check-rides.

[Ex. D (Dep. Ex. 2); *see also* Ex. E (Dep. Ex. 3); Declaration of Rob Strickland, Ex. F, at ¶¶ 6-10.]

6.      During his training, Mr. Williams' supervisor was Rob Strickland, Senior Manager of Human Factors and Pilot Development who is Black/African American.  Mr. Williams believes that Mr. Strickland never acted in a discriminatory manner towards Mr. Williams.  [Williams Dep. Tr., Ex. A, at 145:11-13; 146:13-17; Strickland Decl., Ex. F, at ¶ 2; Rob Strickland Dep. Tr., Ex. G, at 22:9-23:18; 52:9-24; 54:22-55:9.]

7.      In Mr. Williams' new hire class in 2016, in addition to him, there were two other Black probationary pilots, Ryan Taylor and Travis Diltz.  Both First Officer Taylor and First Officer Diltz successfully passed their probationary training and remain employed by United today.  [Williams Dep. Tr., Ex. A, at 56:1-58:15; Strickland Decl., Ex. F, at ¶ 12.]

8.      On January 31, 2016, First Officer Chuck Taylor (who has been with United since March 1998), in an effort to be kind, brought three Slurpee drinks (a cherry, a grape, and a blue coconut) to the first procedures validation training he had with Mr. Williams and his partner, (then First Officer and now Captain) Cliff Davis.  First Officer Taylor offered First Officer Davis and Mr. Williams their choice of the flavors, before taking the last one for himself.  [Chuck Taylor Dep. Tr., Ex. H, at 8:8-16; 116:25-118:9.]  Since First Officer Taylor always gets the last choice of flavors, he only buys flavors that he likes.  [*Id.* at 118:3-9.]

9.      On February 3, 2016, during the final procedures validation training, Mr. Williams was paired with First Officer Brad Halloran.  [Ex. E (Dep. Ex. 3).]

10.      During the procedures validation training, after observing that Mr. Williams had pacing issues, would stop responding, and would sit there "not doing anything," First Officer Taylor took Mr. Williams to see Mr. Strickland  [Taylor Dep. Tr., Ex. H, at 88:11-15; 89:17-24; 109:25-111:15; Strickland Dep. Tr., Ex. G, at 88:3-8; 88:18-25.]  After Mr. Strickland provided some mental and physiological tips to Mr. Williams, Mr. Williams' performance improved.  [Taylor Dep. Tr., Ex. H, at 111:16-112:20; 114:11-24.]  Additionally, in an effort to help Mr. Williams, Mr. Strickland provided information and resources for Mr. Williams to First Officer Kevin Mauch, the instructor who taught Mr. Williams during the maneuvers validation phase.  [Ex. I (Dep. Ex. 72); Ex. E (Dep. Ex. 3); 30(b)(6) Dep. Tr., Ex. B, at 156:13-157:9; 157:17-158:8.]

11.     Leading up to the procedures validation testing, First Officer Taylor decided to conduct First Officer Davis' validation first to ensure that Mr. Williams would have more time to test (and hopefully pass).  First Officer Taylor told Mr. Williams, in light of the prior training issues, that he would not be able to be validated unless he was able to operate the jet safely.  He conveyed that message by pointing out that he wants to be sure his family would be safe flying if Mr. Williams were the First Officer.  [Taylor Dep. Tr., Ex. H, at 125:11-128:12.]

12.     Mr. Williams admits that First Officer Taylor did not make any discriminatory decisions regarding Mr. Williams, and in fact, First Officer Taylor passed Mr. Williams on his procedures validation.  [Williams Dep. Tr., Ex. A, at 284:1-10; Taylor Dep. Tr., Ex. H, at 114:25-115:4; 136:6-18; 139:13-22; 141:8-12; 156:21-25.]

13.     Mr. Williams successfully completed his basic indoctrination, systems validation, procedures validation (by First Officer Taylor), and maneuvers validation (by First Officer Steve Renfro), and then proceeded to his LOFT.  [Williams Dep. Tr., Ex. A, at 147:9-20; 148:5-14; Steve Renfro Dep. Tr. Ex. J, at 16:9-11; Ex. E (Dep. Ex. 3)].

**B.     Additional Training Was Provided to Mr. Williams Leading Up To His Two Failed Check Rides.**

14.     At the start of his LOFT phase, Mr. Williams successfully completed his first three full flight simulator rides ("FFS") with First Officer Todd Ziegler, who has been instructing probationary pilots on the Airbus since 2007, with the exception of a two-year military leave of absence.  [Todd Ziegler Dep. Tr., Ex. K, at 26:6-9; 27:11-18; Ex. E (Dep. Ex. 3)].

15.     However, on February 17, 2016, the date of his fourth FFS with First Officer Ziegler, in lieu of recommending that Mr. Williams advance to his qualification line oriented evaluation ("QLOE" or "check ride"), First Officer Ziegler recommended Mr. Williams for two

additional trainings based on Mr. Williams' deficient performance during the fourth FFS.  First

Officer Ziegler stated, "Mr. Williams had difficulty and again was performing below standards for

where he should be at his phase in training . . . ."  First Officer Ziegler also pointed out that Mr.

Williams needed to focus on "getting back to his procedures once he has been distracted," work

on the "computer loading process," and speaking up "when he doesn't understand something and

state his . . . concern instead of if just sitting there."  [Ziegler Dep. Tr., Ex. K, at 68:23-71:21;

72:14-74:13; 77:10-22; 79:1-21; 81:8-17; 115:1-24; 120:23-123:5; 131:23-132:23; Ex. E (Dep.

Ex. 3); Ex. L (Dep. Ex. 19)].

16.     On February 20, 2016, Mr. Williams had an additional training session with First

Officer Greg Schuster.  [Ex. E (Dep. Ex. 3).]  In the Additional Training Worksheet, First Officer

Schuster noted, "major trouble point for today was not flying in the [flight director] while hand-

flying which bit him repeatedly . . . ."  [Ex. M (Dep. Ex. 20).]

17.     On February 21, 2016, Mr. Williams had another additional training session with

First Officer Dave Prewitt.  [Ex. E (Dep. Ex. 3).]  First Officer Prewitt also did not recommend

Mr. Williams for his check ride because Mr. Williams was "below standard in Ground operations

to include Supplementary engine start procedures, Pushback/after start, re-routes and CRM [crew

resources management]/TEM workload management."  [Ex. N (Dep. Ex. 73 at p. 2); Ex. O (Dep.

Ex. 21); Ex. P (Dep. Ex. 22).]

18.     "The enhanced pilot proficiency policy is a policy that was crafted by agreement

between the Airline Pilots Association and the company to outline how [United] would deal with

pilots who were having trouble in training, having proficiency issues."  [Strickland Dep. Tr., Ex.

G, at 66:21-67:5; Ex. Q (Dep. Ex. 18).]

19.    Based on Mr. Williams not being recommended for his check-ride and having "received information that there was a proficiency deficit, [Mr. Strickland] arranged for a probationary review panel [the first step in the enhanced pilot proficiency policy] to determine what the issues [were] and the best remediation strategy." [Strickland Dep. Tr., Ex. G, at 128:20-25; Ex. N (Dep. Ex. 73); 30(b)(6) Dep. Tr., Ex. B, at 152:23-153:5.] Everyone participating in the probationary review panel "is there to represent the pilot." [Strickland Dep. Tr., Ex. G, at 143:19-144:23.]

20.    With respect to Mr. Williams' probationary review panel which happened by conference call as per normal procedure, the participants included Mr. Strickland as facilitator, Captain Mike McCasky (Managing Director of Flight Training), Captain John Weigand (Managing Director of Flight Standards), and Captain Kerry Boltinghouse (Acting Senior Manager – Fleet Training A319/320). [Mike McCasky Dep. Tr., Ex. R, at 34:6-21; 40:14-24; John Weigand Dep. Tr., Ex. S, at 19:3-21:16; Ex. N (Dep. Ex. 73); Ex. T (Dep. Ex. 75).] After the probationary review panel's call on February 23, 2016, "[t]he decision was made to continue training and a remediation plan was designed and implemented." [Strickland Dep. Tr., Ex. G, at 145:2-6; 157:19-25.]

21.    Mr. Williams admits that by this time, his confidence had been rattled. [Williams Dep. Tr., Ex. A, at 184:23-186:8.]

22.    As part of Mr. Williams' remediation plan, three additional trainings were scheduled for March 5-7, 2016. [Ex. E (Dep. Ex. 3.] On March 5, 2016, Mr. Williams had a warm-up session with First Officer Joe Guerra. [Williams Dep. Tr., Ex. A, at 189:6-10]. A warm-up is "to try to address certain issues that need to be addressed to get the student up to speed for

the check-ride or for validation, whatever the case might be . . . ."  [Renfro Dep. Tr., Ex. J, at 24:16-25:3.]  During this warm-up, Mr. Williams read a checklist and programmed a computer, as he admits that prior instructor notes had criticized his computer-loading skills.  [Williams Dep. Tr., Ex. A, at 189:11-190:14; 190:24-192:3.]

23.     With respect to his March 6, 2016 warm-up, Mr. Williams was timed "loading the box [FMCG]."  [Williams Dep. Tr., Ex. A, at 192:24-193:13.]

24.     The following day, March 7, 2016, Mr. Williams flew in his simulator session and his co-pilot was Captain Melissa "M'Lis" Ward, an African-American female senior pilot who is also an evaluator.  [Williams Dep. Tr., Ex. A, at 196:10-22.]  That day his instructor, First Officer Renfro, recommended Mr. Williams for his check-ride (an action required to advance in the training program).  [*Id.* at 197:2-5; Renfro Dep. Tr., Ex. J, at 180:23-181:7.]

25.     As stated above, check rides are FAA events.  [Williams Dep. Tr., Ex. A, at 283:13-15; 332:24-333:6 ("There's not an American check ride, a United check ride, a Delta or an Extra. FAA straight across the board."); Mark Rosenhahn Dep. Tr., Ex. U, at 44:2-21 ("As a designated examiner, which is when we're working for the FAA and issuing licenses, we are watched and evaluated by the FAA on an annual basis."); 30(b)(6) Dep. Tr., Ex. B, at 80:19-25.]

   **C.     Plaintiff Is Unable To Successfully Pass Either Of His Check Rides After Receiving Five Additional Training Sessions (Which 98% Of Probationary Pilots Do Not Require); Thus, His Employment Is Terminated.**

26.     Ninety-eight percent of United's probationary pilots are successful the first time through the training curriculum; Mr. Williams, however, received 280% of the normal LOFT training before proceeding with his first check ride.  [McCasky Dep. Tr., Ex. R, at 90:9-14; 30(b)(6) Dep. Tr., Ex. B, at 174:23-175:10.]

27.     On March 8, 2016, Mr. Williams attempted his first check ride.  [Ex. E (Dep. Ex. 3).]  The FAA evaluator was Captain Dave Wood (hired by United in 1988).  First Officer Pete Catalano (a fully qualified instructor on the A320 since 2012) served as the captain during the check ride ("captain seat-fill").  [Williams Dep. Tr., Ex. A, at 197:25-198:2; 198:10-18; 219:17-24; Pete Catalano Dep. Tr., Ex. V, at 11:14-16; Dave Wood Dep. Tr., Ex. W, at 16:6-14.]

28.     Captain Wood, as an FAA examiner, could not pass Mr. Williams on his first check-ride, as set forth in the Additional Training Report he completed, based on Mr. Williams' inferior ground operations; his unacceptable actions during a traffic collision avoidance system ("TCAS") event; failure to properly set the altimeter; and his decision to start descending without telling First Officer Catalano.  [Williams Dep. Tr., Ex. A, at 202:3-203:23; 205:21-206:6; Catalano Dep. Tr., Ex. V, at 79:14-81:5; 82:14-24; 101:2-11; 107:11-17; 114:15-115:13; Wood Dep. Tr., Ex. W, at 148:5-11 (explaining his mindset in each check ride as an FAA examiner:  "My standard operating procedure is everybody that comes to my check ride has a clean slate and he gets to start out and he proves himself during this event."); 183:8-20; 193:17-196:1; 196:17-197:6; 201:18-202:7; 205:10-17; 209:24-212:4; 213:12-215:6; 237:10-21; 238:22-239:3; Ex. X (Dep. Ex. 24).]

29.     After failing his check ride, Mr. Williams contacted his United pilot mentor, Joe [last name unknown], and the two of them called First Officer Catalano.  First Officer Catalano told Mr. Williams to "stick with it," and offered encouraging advice.  [Williams Dep. Tr., Ex. A, at 279:1-280:18; Catalano Dep. Tr., Ex. V, 29:16-30:11; 31:12-33:6 ("I think, personally, that was one of Ellis's issues is he was trying to evaluate himself and say, 'I'm not doing that well, I don't think this is going well.'  And my advice was to just get on the bike and pedal.")]

30.     After Mr. Williams' first failed check ride, and pursuant to the enhanced pilot proficiency policy, a review panel was convened on March 10, 2016.  [Ex. Y (Dep. Ex. 80); 30(b)(6) Dep. Tr., Ex. B, at 167:24-168:9.]  "The final review panel reviews all of the information available and makes a decision on whether or not we'll continue with any other training [for a probationary pilot] or if we decide to go in a different direction."  [McCasky Dep. Tr., Ex. R, at 85:21-86:1.]  Although it was decided by the review panel that Mr. Williams would not be offered additional training or a second attempt to pass a check ride, [30(b)(6) Dep. Tr., Ex. B, at 195:11-196:7; 197:1-9; Strickland Decl., Ex. F, at ¶ 11], Captain McCasky subsequently changed his mind. When Mr. Strickland brought Mr. Williams to Captain McCasky's office to hear the review panel's decision, Captain McCasky offered Mr. Williams additional training and another opportunity at a check ride.  [Williams Dep. Tr., Ex. A, at 213:16-214:16; Strickland Dep. Tr., Ex. G, at 113:14-114:6.]  Mr. Williams did not mention that he felt he was being discriminated against (or treated unfairly in any way) to either Captain McCasky or Mr. Strickland.  [Williams Dep. Tr., Ex. A, at 215:10-14.]

31.     For the next additional training, Mr. Williams participated in another warm-up session on March 15, 2016 with First Officer Renfro, and Mr. Williams did not believe there was anything discriminatory about this event.  [Williams Dep. Tr., Ex. A, at 216:22-217:12.].  Again, First Officer Renfro recommended Mr. Williams for his second check ride.  [*Id.* at 217:13-23.] During this warm-up, they worked extensively on reroutes, and did it "two, three, four or five times," "until [Mr. Williams] was able to successfully get through the reroute, sequence the box correctly and we were able to expect that it would work out just fine."  [Renfro Dep. Tr., Ex. J, at 37:8-38:21; 41:11-42:18; 194:5-11.]

32.     On March 16, 2016, Mr. Williams took his second check ride; this time his FAA evaluator was Captain Mark Rosenhahn (hired by United in July 1989; certified as an A320 Airbus instructor in 1993) and his captain seat-fill was First Officer Renfro with whom he had practiced the previous day.  [Williams Dep. Tr., Ex. A, at 218:22-219:24; Rosenhahn Dep. Tr., Ex. U, 21:17-22; 23:22-24:1; 86:20-87:3 (Captain. Rosenhahn stated he did not want to know details regarding the first failed check ride because he "wanted to go in without a preconceived idea.").]

33.     During the debrief, which happens after the check ride, Captain Rosenhahn expressed three significant concerns to Mr. Williams which were encapsulated in Captain Rosenhahn's Additional Training Report and QLOE Notes:  (1) Mr. Williams did not seem to know what kind of take-off they were doing and was unable to find the appropriate check list for the procedure; (2) Mr. Williams, as the monitoring pilot, failed to recognize when First Officer Renfro briefly went below the appropriate altitude; and (3) Mr. Williams flew his approach below minimums with no runway in sight which Mr. Williams admits is a "deadly" action.  [Williams Dep. Tr., Ex. A, at 231:13-15; 237:17-238:19; Renfro Dep. Tr., Ex. J, at 73:1-21; 79:10-13; 81:15-82:2; 86:6-16; 110:18-111:22; 116:22-117:8; 126:14-127:9; 166:13-16; 200:19-201:20; 208:10-12 ("For somebody to willfully continue below that after minimums and not seeing anything, being told nothing is in sight, that's where the problem is."); Rosenhahn Dep. Tr., Ex. U, at 78:7-79:14; 96:24-97:11; 97:22-98:25; 100:10-23; 108:10-17; 128:5-130:17; 134:6-135:19; 153:3-23; 155:3-13; 166:24-167:25; *see also* 9:17-10:3 (describing observing inconsistent situational awareness); Ex. Z (Dep. Ex. 25).]

34.     Captain Rosenhahn thus noted that Mr. Williams failed his second check ride, and explained that the determining factor was "he ended up flying in an approach below minimums

with the runway not in sight and did not go around until he was instructed to by the instructor, by the seat fill-in."  [Rosenhahn Dep. Tr., Ex. U, at 8:17-9:7; 156:11-15; 257:3-11; 266:17-21 ("[M]y responsibility as an evaluator is to ensure that the traveling public stays safe here."); 272:9-23; *see also* Wood Dep. Tr., Ex. W, at 111:24-113:5 ("[D]escending below minimums [] is the biggest no-no in our industry."); McCasky Dep. Tr., Ex. R, at 166:19-167:15 ("United did not fail Mr. Williams.  The FAA did.").]

35.     Captain Rosenhahn and First Officer Renfro independently prepared narratives of the second failed check ride, close in time to the event, which are consistent with each other, and consistent with what was shared with Mr. Williams in the debrief.  [*Compare* Ex. A-1, (Dep. Ex. 26) to Ex. A-2 (Dep. Ex. 83); Renfro Dep. Tr., Ex. J, at 168:14-18; 146:14-25; 142:9-13; Rosenhahn Dep. Tr., Ex. U, at 110:13-111:1.]

36.     Mr. Williams acknowledges that the "significance of flying below minimums" is "deadly." [Williams Dep. Tr., Ex. A, at 231:13-15].  He further agrees that "the safety of the flying public" is "100 percent" the goal and "[t]he objective is safety, safety, safety."  [*Id.* at 141:5-8; 228:12-13.]  Mr. Williams further never informed any United manager that he believed the reasons he failed his check rides were false or discriminatory in any way.  [30(b)(6) Dep. Tr., Ex. B, at 182:8-184:4; 184:23-185:16.]

37.     Instead, Mr. Williams reached out to a United pilot who in turn reached out to Ben Salley, another United pilot (Black/African American) with the Air Line Pilots Association, who then called Mr. Williams.  [Ex. F-A (March 20, 2016 Email); Strickland Decl., Ex. F, at ¶ 13.] Captain Salley reported as follows:

14

Upon speaking with Ellis, I relayed my Alpa experience, and conveyed that I deemed it hard to believe that he had "forgotten" how to fly in the short time since he'd been at United.  At that point, and somewhat reluctantly, Ellis relayed the personal issues that had been burdening him since the commencement of his training.  Those issues were:

•      Ellis' wife, also a part-time United gate agent (IAD), is recovering from a surgery and needs additional help in providing care for their 3 daughters (ages 1, 5 & 6)

•      Ellis' in-laws lost their home in Ethiopia causing Ellis to finance their immigration to the US, where they now reside with him; these in-laws provide no financial or emotional support for his family.

•      In late December, Ellis' brother-in-law also moved in with him while Ellis was in training.  This event prompted divorce discussions between his wife and him.

•      Ellis' previous employer shorted his severance pay by 50% forcing him to train with literally no cash to eat with while in training.  Last day Mesa 12/28/2015. First day United 1/5/2016.

•      Ellis' change[] in employment resulted in changes in his schedule that he and his wife could not coordinate.  In-laws do not watch his 3 small daughter. (cultural??)

•      Ellis' in-laws were supposed to move out prior to his employment commencing at United; they changed their minds once he was in Denver.

After Ellis vented all of the personal issues that he was enduring, I asked 2 questions of him: 1) Why did you not let us (United or Alpa) know about this? 2) And when could he resolve these issues and become a productive employee? As to the first question, Ellis answered like virtually all of our pilots do: He thought that he could handle it if he just made it through training. He also relayed his experiences at Mesa and that he was unaware of the resources available to him. Also, Ellis is more mature in life than the average new-hire, therefore his pride certainly made him more reluctant to relay these problems to anyone . . . .

15

Regrettably, Mr. Williams failed to share any of this information with any United manager. [*See* Ex. F-A (March 20, 2016 Email); Strickland Decl., Ex. F, at ¶¶ 13-14]

38.     After Mr. Williams' second failed check ride, a second final review panel was held on March 21, 2016. [Ex. A-3 (Dep. Ex. 81).] During that conference, it was determined that "no further training would be offered." [30(b)(6) Dep. Tr., Ex. B, at 205:5-18.] "[W]e came to the conclusion that we had exhausted all of our resources, at which point the decision was made to offer Mr. Williams the opportunity to resign, and if he refused to, then we would terminate employment." [McCasky Dep. Tr., Ex. R, at 102:19-25.]

39.     Indeed, Captain McCasky testified:

> **Q. What was the basis for terminating Mr. Williams? What was the reason?**
>
> A. The basis was two FAA failed check rides and the ability to -- the failure to make progress. And at that point in time, his certificate was in jeopardy as well and so we did not have any more tools available to address it. So we made the decision to stop training, and as I stated earlier, offer Mr. Williams the opportunity to resign and if he refused to do that, he would be terminated.

[McCasky Dep. Tr., Ex. R, at 104:10-19; 195:24-196:7; *see also* 30(b)(6) Dep. Tr., Ex. B, at 110:16-111:13; 112:21-113:3; 114:24-115:7; 119:2-13; Ex. A-4 (Dep. Ex. 66).]

40.     Mr. Williams was brought in for a second meeting with Mr. Strickland and Captain McCasky at which time Captain McCasky advised Mr. Williams that his employment was being separated, but that he had the option to resign in lieu of termination, a common practice at United. Mr. Williams chose to have his employment terminated. [Williams Dep. Tr., Ex. A, at 249:5-14; 252:18-25; Strickland Dep. Tr., Ex. G, 203:22-204:1; McCasky Dep. Tr., Ex. R, at 207:3-10; 208:1-10.]

41. Captain McCasky, the Managing Director of Flight Training, is not aware of any probationary pilot who has failed two or more check rides and who was given an option to resign rather than having his/her employment terminated. [McCasky Dep. Tr., Ex. R, at 92:7-21.] Further, and perhaps more significantly, three failed check rides could result in the FAA directly intervening and potentially removing a pilot's license. [30(b)(6) Dep. Tr., Ex. B, at 245:1-246:1; 246:24-247:7.]

42. Mr. Williams testified that: he was never distracted during any training session [Williams Dep. Tr., Ex. A, at 153:21-25]; there was nothing he wishes he could have done better on his first check ride [*id.* at 201:11-16]; and the reasons Captain Rosenhahn gave for failing Mr. Williams on the second check ride were "inconsequential" [Rosenhahn Dep. Tr., Ex. U, at 191:21-192:18.]

43. Mr. William's instructors noted his refusal to take responsibility for any of his performance issues. [Renfro Dep. Tr., Ex. J, at 165:5-8 ("But I do remember that he couldn't accept responsibility for a single error that was made during the event, and nobody has a perfect event; nobody.").]

**D.** **Mr. Williams Never Complained Of Any Discrimination, And, In Support Of His Claims, Alleges Only Derogatory Comments Or Decisions With Which He Disagreed.**

44. In purported support of his claims, Mr. Williams alleges that he experienced racial or national origin discrimination on the following dates while at United: January 31, February 3-4, 17, 20-21, and March 5-6, 8, and 16, 2016, *i.e.*, days on which Mr. Williams trained and was deemed to have performed inadequately and the Slurpee / "gentle giant" purported incidents. [Williams Dep. Tr., Ex. A, at 117:16-118:22; 127:25-128:20; 132:25-133:7; 134:22-135:1;

167:18-168:7; 184:16-187:16 (Mr. Williams alleges he suffered discrimination when First Officer Halloran purportedly called him a "gentle giant," although he does not know how that was related to his race or national origin, and  admits that there was nothing discriminatory about his second meeting with First Officer Halloran on or around February 24, 2016.); 319:14-320:10; *see also* Ex. A-5 (Dep. Ex. 23).]

45.     Although Mr. Williams never complained about it, he now contends it was also discriminatory to separate him from his training partner, Cliff Davis, during their training, because an instructor captain seat-fill during the check ride "does not have anything to lose" in his opinion, compared to (then First Officer) Davis who was testing to progress to a Captain position. [Williams Dep. Tr., Ex. A, at 275:3-23.]

46.     However, First Officer Ziegler recommended that First Officer Davis continue on to his check ride because he was ready for the check ride and "there was no reason to keep him behind to stay with Mr. Williams for his additional training.  And for additional training purposes, I personally think it's better for the student to have a structured support person . . . ."  [Ziegler Dep. Tr., Ex. K, at 139:1-14; 141:20-142:7.]  Moreover, instructor captain seat-fills, such as First Officer Renfro and First Officer Catalano, can indeed lose their instructor position if they have an unsatisfactory performance such that they do have something "to lose."  [Renfro Dep. Tr., Ex. J, at 119:8-24; McCasky Dep. Tr., Ex. R, at 68:25-69:12.]

47.     Mr. Williams did not experience any kind of discrimination during his basic indoctrination training [Williams Dep. Tr., Ex. A, at 121:7-10]; during his systems training and validation [*id.* at 126:13-16]; or during his maneuvers training and validation.  [*Id.* at 148:5-14.]

48.     Mr. Williams identified statements/actions he deems to be "derogative" [sic], but failed to explain how those statements have anything to do with race or national origin or discrimination. [Williams Dep. Tr., Ex. A, at 123:24-125:13.]

49.     Mr. Williams never complained to any United manager about being offended by being offered a Slurpee [Williams Dep. Tr., Ex. A, at 130:17-20; 257:14-258:1; 281:17-20]; did not mention any complaint of discrimination or retaliation during his conversation with his supervisor, Mr. Strickland, on March 9, 2016, after his first failed check ride [*id.* at 210:18-211:11]; and never complained of any discrimination or retaliation during his entire employment with United.  [*Id.* at 215:10-23; Strickland Dep. Tr., Ex. G, at 58:11-18; 91:13-20; 101:4-102:14; 30(b)(6) Dep. Tr., Ex. B, at 125:15-126:1.]  The only thing offered in support of his retaliation claims is Mr. Williams' knowledge of a Consent Decree United entered into in 1976.  [Williams Dep. Tr., Ex. A, at 273:10-15; Dkt. No. 34 at ¶ 52.]

50.     Mr. Williams is suing United because "what was done to me was difficult, and it was wrong," and "because of the damages that was inflicted . . . .," although he cannot identify any discriminatory intent related to the reason for the alleged "malicious act" of him failing his two separate check rides and he does not know any other pilot who failed two check rides and is still employed with United. [Williams Dep. Tr., Ex. A, at 69:13-16; 71:7-10; 303:2-20; 304:21-24; 309:7-12.]

51.     Between 2015 and early 2017, five probationary pilots were separated due to performance difficulties in training.  [Ex. A-6 (Dep. Ex. 34); 30(b)(6) Dep. Tr., Ex. B, at 239:10-24.]  Two were black or African American (one of whom was Mr. Williams), and three were Caucasian.  [30(b)(6) Dep. Tr., Ex. B, at 266:2-6; 280:18-281:5; 285:13-22; 290:1-9.]

## III.     ARGUMENT

### A.     Standard Of Review

The U.S. Supreme Court has unequivocally endorsed the right of a trial judge to grant summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Rejecting limits on the granting of summary judgment, the Court has held that summary judgment is not a "disfavored procedural shortcut," but is an important part of the Federal Rules of Civil Procedure.  *Id.* at 327.

When a moving party has met its burden in identifying an absence of evidence to support the nonmoving party's case, the non-moving party must "go beyond the pleadings," and by affidavits or "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a "genuine issue for trial."  *Id.* at 324.  When the nonmoving party fails to make this showing, "there can be 'no genuine issues as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323.  Federal Rule of Civil Procedure 56 therefore "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing insufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.

In reviewing a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party.  *See Anaya v. Crossroads Managed Care Sys.*, 195 F.3d 584, 590 (10th Cir. 1999).  Nevertheless, conclusory allegations will not establish an issue of fact sufficient to defeat summary judgment.  *See McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1398 (10th Cir. 1987); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

> **B.**    **Plaintiff's Race And National Origin Discrimination And Retaliation Claims All Fail Because His Employment Was Terminated Solely Based On His Inability To Pass His Check Rides.**
>
> **1.**    **Standard for Title VII, CADA, and Section 1981 Claims.**

Because CADA and Section 1981 claims are analyzed under the same framework as Title VII claims, the standards set forth below apply to Plaintiff's first, second, and third claims for relief.  *See St. Croix v. Univ. of Colo. Health Sciences. Ctr.*, 166 P.3d 230, 236 (Colo. App. 2007) (citing *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997));  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (affirming summary judgment in the employer's favor on plaintiff's race discrimination and retaliation claims under Title VII and Section 1981); *Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005) ("In racial discrimination suits, the elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII.") (quoting *Drake v. Ft. Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991)).

> **a.**    **Discrimination**

An employer cannot "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S. § 2000e-2(a)(1).  A plaintiff can prove that his employer discriminated against him by providing either direct or circumstantial evidence of discrimination (*see Stone v. Autoli v. ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000)); however, as Mr. Williams has not deduced any direct evidence, his discrimination claims must be analyzed by applying the

burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002).

A plaintiff establishes a *prima facie* case for race or national origin discrimination under the *McDonnell Douglas* framework by showing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position at issue; and (4) he was treated less favorably than similarly situated employees not in the protected class. *See Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir.1998). Then, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment action. Once the employer does so, the plaintiff bears the ultimate burden of proving that the employer's tendered reason is false and a pretext for discrimination. *Crowe*, 649 F.3d at 1195.

### b.      Retaliation

To establish his *prima facie* case of retaliation under Title VII or CADA, Mr. Williams must prove that: (1) he engaged in protected opposition to discrimination; (2) United took an adverse employment action against him subsequent to or after the protected activity; and (3) a causal connection existed between the protected activity and the materially adverse action. *Medina v. Income Support Div.*, 413 F.3d 1131, 1135-36 (10th Cir. 2005). Moreover, a plaintiff alleging retaliation "must establish that his or her protected activity was the but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

### 2.      United Legitimately Terminated Mr. Williams' Employment As He Could Not Successfully Complete His Training.

Even if Mr. Williams could establish his *prima facie* cases for his discrimination and retaliation claims (which he cannot as explained below), United easily articulates a legitimate, non-discriminatory/non-retaliatory reason for the termination of his employment. Of course, it is

well established that "[t]his burden is one of production, not persuasion; it can involve no credibility assessment." *Smith v. Millennium Rail, Inc.*, 241 F. Supp. 3d 1183, 1196 (D. Kan. 2017) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993))).

Here, United terminated Plaintiff's employment due to the sole fact that he failed two FAA administered check rides after receiving five additional training sessions.  [SOF ¶¶ 15, 22, 28, 33-34, and 38-39.]  Indeed, had his employment not been terminated and had he failed a third check ride, he was at risk of the FAA taking away his pilot's license.  [SOF ¶ 41.]  Further, there have been no other probationary pilots who failed two check rides and whose employment was not terminated.  [SOF ¶¶ 41, 50.]

### 3. Mr. Williams Cannot Prove That United's Reason For Terminating His Employment Was Pretextual.

As United has proven a legitimate, non-discriminatory basis for terminating Mr. William's employment, he must prove that United's reason is pretextual.  Mr. Williams cannot do so based on the undisputed material facts.  "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (internal quotation marks and alterations omitted).  In trying to prove pretext, Mr. Williams must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons," or "direct evidence discrediting the proffered rationale, or by showing that plaintiff was treated differently from others similarly situated." *Smith v. Millennium Rail, Inc.*, 241 F. Supp. 3d 1183, 1200 (D. Kan. 2017) (citations omitted).  "The fact that a plaintiff is required to demonstrate pretext does not grant a jury license to second-guess all

prior hiring, firing and disciplinary decisions no matter how attenuated they might be from the challenged action." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1115 (10th Cir. 2007).

There are no facts in this case suggesting pretext. Captains Wood and Rosenhahn, in their capacities as FAA examiners, determined that Plaintiff did not pass his check rides, and testified extensively to those facts which were also borne out by the numerous prior challenges Mr. Williams had exhibited in his training program which necessitated five additional training sessions. [SOF ¶¶ 28, 32-36.] *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1326 (10th Cir.1999). ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.").

In turn, Mr. Williams simply contends that he does not agree with Captains Wood and Rosenhahn's review of his performance, nor does he agree with the review panel's decisions to accept those evaluations. However, "[a] plaintiff cannot create a triable issue of fact by making an assertion without supporting facts," and "it is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance." *Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1177-78 (10th Cir. 2000) (quoting *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996)); *see also Merritt v. Tellabs Operations, Inc.*, 222 Fed. Appx. 679, 682 (10th Cir. 2007) (holding that plaintiff's subjective evaluations of his performance in other aspects of his job were insufficient to create a genuine issue of material fact as to whether defendant's asserted reasons for terminating his employment were pretextual because the defendant employer had the prerogative to determine which areas of performance were most important). Moreover, Captains Wood and Rosenhahn, in their FAA examiner roles, have contemporaneous notes supporting their decisions that are set forth in their Additional Training

Reports. [SOF ¶¶ 28, 33].  Additionally, Captain Rosenhahn's contemporaneous notes are further supported by First Officer Renfro's separately prepared notes, all of which supported their deposition testimony two and three years, respectively, after the fact.  [SOF ¶ 35.]  On the other hand, there is simply no evidence supporting Mr. Williams' contentions.  [*See generally* SOF.]  Even Mr. Williams admitted after the fact that his two failed check rides were a result of personal family issues, none of which he disclosed to any United manager.  [SOF ¶ 37.]

The undisputed evidence proves that Mr. Williams' employment was terminated solely based on his inability to pass two check rides despite numerous additional training afforded to him, and there is not a shred of evidence that his race or national origin had any bearing on any decision. Because Mr. Williams cannot prove pretext, the Court should grant summary judgment in favor of United on Plaintiff's race and national origin discrimination and retaliation claims.

4.     **Mr. Williams Cannot Prove His *Prima Facie* Case Under Any Theory.**

a.     **Discrimination**

Mr. Williams cannot prove that he was qualified to be a First Officer for United.  The undisputed material facts demonstrate that he was unable to pass two check rides despite extensive additional training over and above that normally give to probationary pilots.  [*See generally* SOF.]  Indeed, there are no other probationary pilots who have failed two check rides and who have been permitted to remain employed by United.  [SOF ¶¶ 41, 50.]

Nor can Plaintiff demonstrate that he was treated differently than similarly situated employees who are not Black or Antiguan.  [SOF ¶ 51.]  It is difficult to believe that United would discriminate against Mr. Williams on the basis of race and/or nationality, but continue to advance two other Black pilots from his class.  [SOF ¶ 7.]  Additionally, United has held Caucasian

employees to the same standards as evidenced by the fact that three White pilots were separated from United during their probationary period due to performance issues.   [SOF ¶ 51.]

### b.  Retaliation

Nor can Mr. Williams prove even the first element of his retaliation *prima facie* case as he engaged in no protected opposition to discrimination.  Title VII's anti-retaliation provision has two clauses, an opposition clause and a participation clause.   "The opposition clause makes it 'unlawful . . . for an employer to discriminate against any . . . employe[e] . . . because he has opposed any practice made . . . unlawful . . . by this subchapter.'" *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (quoting § 2000e-3(a)).   The participation clause "protects an employee from adverse employment action taken on the basis of the substance of a charge or testimony []he makes in the course of [his] participation in Title VII EEO proceedings."  *Egei v. Johnson*, 192 F. Supp. 3d 81, 92 (D. D.C. 2016).  As it is clear that Mr. Williams' claims are not premised on retaliation based on filing any charge or complaint or providing testimony, his retaliation claim must proceed under the opposition clause.

Here, however, Mr. Williams never complained of or opposed any discriminatory practice during his employment.  [SOF ¶ 49.]  To the extent Mr. Williams now contends that he was retaliated against based on a Consent Decree issued in 1976 [SOF ¶ 49; Dkt. No. 34 at ¶ 52], he was not party to that Decree or the suit leading up to it; *i.e.*, he personally did not engage in protected opposition to discrimination or participate in such opposition.

Even if Mr. Williams could prove that he engaged in protected opposition to discrimination (which he cannot), he cannot prove causation, much less that any purported "protected activity was the but-for cause" of the termination of his employment. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*,

570 U.S. 338, 362 (2013). First, the undisputed material facts make clear that his employment was terminated because of his two failed check rides. [SOF ¶ 39]. More importantly, however, Mr. Williams has belatedly admitted that his inability to pass the two check rides was due to personal family issues, and not to any purported discrimination or retaliation. [SOF ¶ 37]. Under these undisputed facts, summary judgment is warranted in United's favor on Mr. Williams' first three claims for relief.

### C.    Mr. Williams Was Not Subject To A Hostile Work Environment.

Title VII's prohibition against discrimination can be violated if an employee is subjected to a hostile work environment based on a protected characteristic. *Faragher v. City of Boca Raton*, 524 U.S. 775, 777-87 (1998) (environmental harassment claims are actionable on any of Title VII's protected bases). To establish a case of hostile work environment harassment, a plaintiff must show that: (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment was based on his race or national origin; (4) the harassment was sufficiently severe and pervasive so as to alter a term, condition, or privilege of his employment; and (5) there is a basis for employer liability. *See generally Morris v. City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012).

In evaluating a hostile work environment claim, the Tenth Circuit will examine the totality of circumstances, "including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *DeWalt v. Meredith Corp.*, 288 Fed. Appx. 484, 495 (10th Cir. 2008) (citation omitted). Then, after this analysis, the court determines "whether, taken together, these

circumstances establish that the environment was objectively and subjectively hostile." *Id.*

Here, at most, Mr. Williams contends that being called a "gentle giant" and being offered an alleged watermelon-flavored Slurpee, [SOF ⁋ 44; Dkt. No. 34 at ⁋ 13], gave rise to a hostile work environment. Even assuming those statements are true, which United does only for purposes of this Motion, "[o]ffhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment,'" as Title VII is not meant to be a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. at 788 (citation omitted). Moreover, it is difficult to understand how someone who was allegedly discriminating/harassing Mr. Williams, First Officer Taylor, would then pass him on his procedures validation. This approval did, in fact, alter Mr. Williams' employment, but only in a positive way as he was able to progress in his training.

As there is no evidence of a hostile work environment, Mr. Williams' fourth claim should be dismissed.

## IV.  CONCLUSION

Mr. Williams is a disgruntled former employee who is unable to accept accountability for the fact that he was unable to pass his FAA administered check rides, after five extra training sessions and a warm-up session between the two check rides. There is simply no record evidence whatsoever to support Plaintiff's assertions of discrimination and retaliation; therefore, United respectfully requests that the Court grant it summary judgment as to Plaintiff's Title VII, Section 1981, CADA, and hostile work environment claims.

Respectfully submitted this 30th day May, 2019.

/s/ Michelle L. Gomez
Erin A. Webber
Michelle L. Gomez
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Telephone:  303.629.6200
Facsimile:   303-629.0200
Email:  ewebber@littler.com
             mgomez@littler.com

ATTORNEYS FOR DEFENDANT
UNITED AIRLINES, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of May, 2019, I filed the foregoing **DEFENDANT UNITED AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT** using the Court's CM/ECF filing system which will send notice to all parties of record, and mailed and emailed the foregoing to Plaintiff:

Ellis Williams
23128 Blackhorn Square
Sterling, Virginia 20166
ellisanwill@hotmail.com

*Pro Se* Plaintiff

s/ *Patricia Perez*
Patricia Perez

FIRMWIDE:164645454.3 087218.1019