IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-01191-LTB-NRN

ELLIS WILLIAMS,

      Plaintiff,

v.

UNITED/CONTINENTAL,

      Defendant.

---

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

---

      Plaintiff, ELLIS WILLIAMS, by and through its undersigned counsel, respectfully responds to Defendant's Motion for Summary Judgment (ECF 86), as follows:

## I.      INTRODUCTION AND PROCEDURAL HISTORY

      Plaintiff Ellis Williams is Black and of Antiguan descent.[1]   He is college-educated, bright and speaks with a prominent accent.   When he joined the United Airlines ("United") training program, he had already been a licensed commercial pilot for eleven years. He was accepted into the training program, passed the written evaluations with high marks, and cleared all other hurdles prior to the check rides.   The "check ride" is an evaluation that takes place in a flight simulator, in which no objectively verifiable evidence of what actually happened, was collected.   The check

---

[1]  Antigua is one of two major islands that make up the Caribbean nation of Antigua and Barbuda.   Being native Antiguan, Plaintiff speaks with an accent particular to his country of origin.

ride would be the perfect opportunity for United to make sure that someone who it did not want as an employee, did not become one.   The true story of this case is what actually happened on those check rides, and for each, there are three witnesses (Plaintiff, the instructor and the "seat fill captain,") and no objective evidence.

On January 31, 2016, Plaintiff's flight instructor Taylor greeted him by handing him a watermelon Slurpee and later shared a rant with him about how many trainees with foreign accents had been terminated since he started there.   Taylor brought him to the office for a debriefing even though Plaintiff had successfully completed his activities and spread misinformation about Plaintiff to subsequent instructors.   After his encounter with Taylor, Plaintiff complained to Human Resources, but his situation only got worse after that.   Shortly thereafter, another instructor, most likely influenced by Taylor, assigned him additional training while letting Plaintiff's partner move forward.   Once separated from his partner, Plaintiff was at a disadvantage as both the instructor and seat fill captains worked against him during the check rides.

Plaintiff adamantly asserts that under the standards of the FAA and United, he did not fail either check ride and that Defendant manufactured the factual circumstances to fail him and illegally terminated him, all based upon his race and national origin.   There is no objective evidence of what really happened in any of these simulators and so the admitted fundamental issue - whether the plaintiff failed or passed his check rides -is disputed.   (Email from Gomez to Ford, Attorney Plaintiff, Ex. 2, November 27, 2018, 1:14PM).

Summary judgment should be denied in this case because the evidence, viewed in the light most favorable to Plaintiff, is sufficient for a jury to conclude that:

1. Plaintiff was subjected to discrimination and a hostile work environment, starting with United's instructor Chuck Taylor, continuing with separating him from his similarly situated white counterpart after both passed procedures validation, then deviating from published training guidelines by taking passing Plaintiff for a sit down with a senior manager, continuing with various kinds of invented additional training and new obstacles created uniquely for Plaintiff and culminating with his termination;

2. United retaliated against Plaintiff after he reported Taylor's treatment of him to the Senior Manager, Human Factors and Pilot Development representative Rob Strickland by spreading the word about him and inventing a series of new obstacles to stop Plaintiff from succeeding:

3. The claimed failed check rides were a pretext for discrimination; riddled with inconsistencies and irregularities, including many deviations from the FAA approved United Advanced Qualification Program (AQP). The check rides devised for Plaintiff and other Black pilots provided cover for terminating Plaintiff illegally.

Submitted with this Response are Declarations of other United pilots and trainees. Richard John has been a United pilot for 27 years and was Line Check pilot, from 2013-17. (John Dec., Exh. 3, ¶ 2-3). In that capacity, he acquired first-hand knowledge of Standard Operating Procedures ("SOP" or "SOPs") for evaluating pilots on the A 320. Plaintiff called John after the second check ride and described to him what happened on the check ride, to him. John identifies four deviations from SOP in the second check ride and notes that some of Plaintiff's additional training was irregular. (John Dec., Exh. 3, ¶ 6, 11).

Michael Kabbah, the other Black pilot terminated from Defendant's 2016 training program, has also provided a Declaration. Kabbah is also well-educated (MBA from Columbia) and speaks

with a foreign accent. (Kabbah Dec., Exh. 4, ¶ 2,4).   Like Plaintiff, he was paired with a much more experienced pilot to start but then separated from that pilot.   (Kabbah Dec., Exh. 4, ¶ 6,8). Kabbah explains why being separated from his training partner and being put with a "neutral" seatfill was a major disadvantage. (Kabbah Dec. ¶ 14-17). Mr. Kabbah's Declaration shows a pattern of discrimination against Black pilots and pilots with of protected national origin with foreign accents, facilitated by separating them from a true training partner.

Plaintiff commenced this action pro se, then his first counsel Karen Ford filed an amended complaint on November 11, 2017 (ECF 34), setting forth nine causes of action.   Defendant filed a partial motion to dismiss and on June 26, 2018, Magistrate Judge Watanabe recommended that the motion be denied for Plaintiff's claims for hostile work environment. The facts listed as the basis for denial are now supported by evidence, set forth in sections C, D, E, F, G-K below.

## II.   PLAINTIFF'S STATEMENT OF MATERIAL FACTS

A.  Plaintiff was an employee of United from January 5, 2016 through March 23, 2016.   He was a pilot trainee and indeed, met all of the United's requirements but was terminated because he failed, that Plaintiff claimed passed, two check rides.     The check rides are the final stage of pilot training, following successful completion of written testing, procedures validation, maneuvers validation and Line-oriented flight training (LOFT).

B.  On or around January 20, 2016, Plaintiff was paired with Cliff Davis, who was to be his training partner through the check rides and completion of the training program.   According to the AQP manual, pilots are evaluated based upon their performance in a crew and it is customary to keep training partners together through the program.   (AQP Training Guide, Exh. 5, at §. 3.2, 17).

C.  On January 31, 2016, Pilot Instructor Charles Taylor offered Williams a watermelon flavor Slurpee drink and offered a cherry flavor to his crew partner Davis, which Plaintiff alleges was an intentional racial slur. (Williams Dep., Exh. 6, at 128:3-5 129:2-5: Taylor Dep., Exh. 7, at 116:25,117:1-12; Williams Dec., Exh 25, ¶ 4).  Defendants deny the Watermelon Slurpee allegation and Taylor's testimony sets up a disputed material fact. Taylor in his deposition states: I purchased three Slurpee drinks -- a cherry, grape, and a blue coconut (Taylor Dep., Exh 7, at 117:7-8).  Blue coconut was not offered as a 7-11 Slurpee in 2016. (Exh. 8, Yeah That's Kosher, *"Kosher Slurpee Flavors List 2016"*, 6 July 2016).  The stereotype that African Americans are excessively fond of watermelon is a racist trope historically used for political purposes to denigrate black people in this country. (Exh. 9, William Black, *"How Watermelons Became a Racist Trope,"* The Atlantic, 8 December 2014[2]).

D.  During training on February 2, 2016, Instructor Taylor instructed Plaintiff to "just sit on your hands and watch," and then criticized him for not doing anything, refusing to acknowledge that he had told Plaintiff to only sit and watch. (Williams Dep., Exh. 6, at 134:2-9; Williams Dec., Exh. 25, ¶ 5), Taylor admits these instructions, but states he meant to not do anything without instruction; (Taylor Dep., Exh.7, at 118:10-15). Instructing Plaintiff to "just sit on [his] hands" was not similarly done with Davis and was in direct conflict with the AQP format of training which is designed to be a "crew-oriented evaluation." (AQP Training Guidance, Exh. 5, at §. 3.2, 17; Ziegler Dep., Exh. 10, at 23:19-24) Taylor's purpose for this instruction is disputed.

E.  United claims that based upon Plaintiff's performance on February 2, 2016 when Taylor told him to sit on his hands, Plaintiff has pacing issues. (ECF 86, SOF ¶ 10).  Plaintiff *denies*

---

[2]  When American slaves won their emancipation during the Civil War in the 1860's, free black people grew, ate and sold watermelons, and in doing so made the fruit of symbol of their freedom.    Id.    It symbolized black self-sufficiency.

having "pacing" issues in procedures validation training. Plaintiff ultimately "kicked ass" on the procedures validation, according to Taylor (Taylor Dep., Exh. 7, at 141:8-13).

F.  On February 3, 2016, Instructor Brad Halloran told Plaintiff and Davis, "I think both of you are doing a great job," and "[i]f I was giving you your evaluation you both would have no problem passing." He then addressed Plaintiff, "Ellis, I don't find there's a problem with you, I think you're just like a gentle giant." (Williams Dep., Exh. 6, at 186:12-15).  When he remarked "Ellis, I don't find there's a problem with you…."   that comment revealed that Instructor Halloran had been told that there was a "problem" with Plaintiff by biased Taylor and then linked it to his physical appearance as some type of "threat."   Plaintiff is 6'4" tall and 300 lbs. Large Black men have traditionally been considered a threat in our society as revealed in recent news reports of police brutality and excessive use of force.   Plaintiff did not explain how discriminatory this was in deposition but did so in (Plaintiff's Supplemental Response to Interrogatory No 6, Exh. 13, p. 6). Either way, a jury could find the comment discriminatory because it was insulting, personal, irrelevant and indicative of aforethought and prejudice.

G.  Plaintiff testified that Taylor disparaged his abilities on around February 2, 2016, by telling him, "So far, I know of four people who had failed and got fired, three of which were Hispanic with heavy accents."   That bias influenced Plaintiff's training from there on out as Taylor spread "the dirty low down about him," coloring his peers' actions by his unfavorable impressions based on prejudice arising from Plaintiff national origin and race. (Williams Dep., Exh. 5, at 135:18-19; Strickland Dep., Exh. 12, at 87:23-25, 88:1-8).   Davis was present during this rant.   Taylor's reference to others failing the check ride and tying it to such persons

being Hispanic "with heavy accents" is per se offensive evidence of national origin discrimination but particularly so when considered in context.

H. Taylor then made comment expressing that Plaintiff would only pass his check ride because Davis, who is Caucasian and not of Hispanic descent and has no foreign accent, "isn't going to let you make him fail his check ride."   This is the basis on which he took Williams first to Senior Manager Chris Neuberger who was not available and then to Rob Strickland even though Plaintiff and Davis had passed.   Digging for subjects of criticism, Taylor added that Plaintiff had mis-typed one of their waypoints into the system, speculating to Strickland that Plaintiff is probably dyslexic. (Taylor Dep., Exh. 7, at 150:18-22).

I. Taylor's bias is further revealed in his conversation with Plaintiff at the end of their meeting with Strickland that same day, when he told Plaintiff, after asking who his next instructor would be, that he would contact that instructor to give him the "dirty low down."   This was all despite the fact Plaintiff had passed all testing under Taylor. Taylor said this in the presence of Strickland. (Williams Dep., Exh. 6, at 134:22-25,135:1-12).

J. Plaintiff called Strickland to complain and provide details of how he was treated by Taylor. In his conversation with Strickland on February 4 or 5, 2016, Plaintiff did not use the words discrimination or race or national origin, but he did explain everything with respect to what was said to him in the briefing room in front of Davis, and Mr. Strickland said "No, no instructors are allowed to speak to the students like that" (Williams Dep., Exh. 6, at 144:21-25, 145:1-5).   Plaintiff believed that the reason for Taylor's actions was bias against him based upon his race and national origin, and he tried to convey that to Strickland in the conversation. He had the impression that Strickland understood, but now believes that this impression was mistaken, because Strickland took no corrective actions on his behalf and mistreatment of

Plaintiff intensified after the report. (Williams Dec., Exh.29, ¶ 6-8).    Plaintiff questions why after the procedures validation, Mr. Strickland emailed Mauch regarding Plaintiff's claimed deficiencies (Email Strickland to Mauch, Exh. 11, 4 Feb. 2016).   Strickland cannot explain why he sent the email (Strickland Dep., Exh. 12, at 94:5-11, 105:23-24).

K. Plaintiff and Davis then went to work with instructor Todd Ziegler on February 14-17, 2016. There are disputed issues of fact regarding the evaluation on February 17, which is the event that led to Plaintiff being separated from his training partner.   In Plaintiff's Deposition, among other things, he describes how Ziegler's criticism that Plaintiff "flared too early" during a crosswind landing, but then, when he did it again, flared too late, is foolish, and he explains how he was discriminated against in relation to his Caucasian partner Davis, who is slamming the sim on the ground, and was asked if he wanted to do it again but said Nah, I'm fine, whereas Plaintiff landed the airplane safely on both occasions. Plaintiff also disagrees with Ziegler's assertion that he was challenged in prioritizing tasks, claiming that is "preposterous." (Williams Dep., Exh 6, at 151:7-25, 152:1-7, 153:8-14).

L. Ziegler's deposition supports that he too was given a "dirty low down" originating with Taylor which influenced his evaluation of Plaintiff.   Ziegler explains that the instructors will discuss the trainees among themselves "[I]t's kind of like a football, I guess.   *In other words, Ziegler is comparing Williams to a football being passed from one teammate to another.* "You know, this is how I perceive this student and what they need additional work on . . . passed to the next person that is going to work with that student, and then they do that training based on what information I've passed to them and other documentation they look at"   (Ziegler Dep., Exh.10, at 93:14-22).   Ziegler states he also would have read the report setting forth Taylor's "dirty low down" (Ziegler Dep., Exh. 10, at 87:18-25,88:1).   Despite this normal practice and the

"problems" Plaintiff had with Taylor, Zeigler then inconsistently asserts he did not speak with any instructors prior to working with Plaintiff putting his credibility at issue (Ziegler Dep., Exh 10, at 88: 5-9).

M. On February 17, 2016 after fourth Full flight simulator (FFS) Ziegler wrote an Additional Training report claiming deficiencies in Plaintiff's performance. Plaintiff was only told "I think it will be beneficial for you," (re: extra training) and not told of any of the deficiencies during the training (Williams Dep., Exh. 6, at 159:9-15) until this litigation, and he denies them. There are many disputed issues of material fact regarding why Ziegler recommended Plaintiff for two extra training sessions before his first check ride. In his deposition, Ziegler only specifically recalls a spelling error by Plaintiff; he could recall no other specifics and can only rely on what he set forth in his Additional Training Report (ATR Ziegler 17 Feb 2016, Exh. 14; Ziegler Dep., Exh 10, at 81:18-22). Plaintiff testified that none of what Ziegler wrote on Exhibit 14 happened (Williams Dep., Exh. 6, 162:1-20) and that Ziegler discriminated against him by, among other things, making up reasons after the fact and never sharing his allegations with Plaintiff (Williams Dep., Exh 6, at 151:7-25, 152:1-7 18-25, 153:1-14).

N. After February 17, 2016 Williams is no longer in crew with Davis. Plaintiff alleges that separating him from Davis was discriminatory because he no longer had a comparator and because both he and Davis had passed the training with Taylor. Because the intent was if Mr. Davis and I went through with our check ride, there would not have been a separation. As a result of that, when I have -- when anyone has an instructor as opposed to an ·actual pilot who's going through with a check ride, it means that the instructor can mess up as much as he or she wants.· And there's no penalty to that person. (Williams Dep., Exh. 6, at 275:3-19). This action directly conflicts with the AQP: "Every attempt should be made to have a complete

crew complement scheduled and maintained. Flight crewmember substitution is highly discouraged" (AQP Training Guidance, Exh. 5, at § 3.2,17).

O. On February 20 and 21, Plaintiff had two warm-up sessions.  Plaintiff denies Schuster's factual assertion that he had trouble "not flying in the (flight director) while hand-flying." Plaintiff further contends that Defendant's citation of this claimed deficiency is discriminatory because he did pass this training exercise. (ATR Schuster 20 Feb 2016, Exh. 15; Williams Dep., Exh. 6, at 171:6-9,172:3-12).   There is also an Additional Training Report for the warm-up with Prewitt.

P. On February 23, 2016, a probationary review panel, "TRP" was held to review Williams progress. The TRP panel consisted of Mike McCasky, and senior managers John Weigand and Kerry Boltinghouse. Plaintiff was not informed of this event, could not attend, nor send anyone there on his behalf.  Plaintiff did not know anyone on the panel; everyone there is with United's management or human resources.  (Strickland Dep., Exh. 12, at 142:8-9 21-22; Williams Dep., Exh 6, at 183:18-25,184:1-2).   No one on the panel independently verified the evidence presented before the review panel.   They blindly relied upon information as briefed by Strickland (McCasky Dep., Exh 26, at 74:13-20; 75:1-4).   Strickland too had no direct knowledge of what occurred during those check rides (Strickland Dep., Exh 12, at 162:10).   For example, when questioned as to what a particular note by Ziegler meant, McCasky explains, "Well, I'm not sure since I wasn't there, . . . but I can assume based on this write-up that he was struggling" (McCasky Deposition, Exh. 26, at 136:7-16).   The panel also relied on a review of the training progress record colored by Taylor's bias. The negative impact of the panel not having any direct evidence of the alleged errors is compounded by the fact that the simulator and written records fail to verify who was actually flying at the time of the

subjectively recorded errors. When the pilots are in the FFS, there is no record of the actual manipulation of controls by each person sitting in the seats there. At all times, the review panel "inferred" Plaintiff was flying the airplane (McCasky Dep., Exh. 26, 163:21-25, 164:1-4, 161:25, 162:1-3).

Q.  Plaintiff was assigned additional training sessions on March 5 and 6, but he was never permitted to actually train on or practice flying in any of those sessions.

    *A.* In the warm-up session on March 5, 2016, Plaintiff was *only allowed* to program the computer and read a checklist; he was not permitted to fly at all as Steve Cox, his seat fill, took over and flew the "leg" that Plaintiff was supposed to fly.   After a break, the instructor Joseph Guerra and Steve Cox, switched places. As Plaintiff explains: " *I'm recommended for more sim sessions, but I didn't fly.  All I did was read a checklist and program the computer.  That's it.  Nothing more.  And at the end there was not a debrief. They walked out  and I'm walking behind of them.  And they just walk,*

    *talking to each other.   And that's -- that's ...the end of that.* (Williams Dep., Exh. 6, at 189:11-25, 190:8-14)

    B. Plaintiff was not permitted to fly on March 6th, either. (Williams Dep., Exh 6, at 192:10-16).

R.  The first check ride or QLEO 1A was evaluated by David Wood with seat support pilot, sitting in, Instructor Peter Catalano.   On the March 8, 2016 Additional Training Report (ATR Wood 8 Mar 2016, Exh.16), Plaintiff disputes the facts asserted by Wood.   Note that the official document is illegible in places and laced with poor grammar and spelling, so Ms. Ford had to create a translation for purposes of deposition questioning (Translation of Wood Notes 3/8/2016, Exh. 17; Wood Dep., Exh 18, at 186:9-14).   The list below is created from Wood's

testimony of what he meant when he created the Additional Training Report, with references to the transcript.   The transcript, pages 186-190, reveals that he is confused by and cannot fully decipher the report he wrote, and he also does not really remember what happened.

1.  Ground ops was patchy (Wood Dep., Exh. 18, at 186:16-17), compare (Williams Dep., Exh. 6, 202:11-17 20-25 5, 203:1-9, 208:23-25)

2.  f/o missed bleeds switches during pneumatic start (Wood Dep., Exh 18, at 188:8-24, 190:10-11), compare (Williams Dep., Exh. 6, at 209:3-8)

3.   turned off APU gen (Wood Dep., Exh 18, at 190:10-13); Compare Plaintiff's Dec. ¶ 9.

4.  Did not advocate for himself when ATC gave a clearance to line up and wait (Wood Dep, Exh. 18, 191: 8-11), compare (Catalano Dep., Exh 19, at 90:24-25, 91:1-5).   In his Declaration, Williams explains that he did not have to advocate for himself because he completed all necessary steps for takeoff (Williams Dec., Exh. 25, ¶ 9).

5.  TCAS event- turned on A/P + F/D (Wood Dep., Exh 18, at 204:22-25,205 1-17), compare (Williams Dep., Exh. 6, at 208:4-10).

Wood admits that there is no independent source of information regarding what happened on Plaintiff's simulator ride. (Wood Dep., Exh. 18, at 197:19-24, 199:16, 199:19, 200:9-11).   His score sheet, which ultimately determines whether one passes or fails, has somehow been lost. (Wood Dep., Exh. 18, at 166:8-9).

Catalano, the only other witness to the check ride, had third version of the events on that check ride, recalling mostly that Plaintiff's performance was "fine," "average," including on ground ops (Catalano Dep., Exh. 19, at 50:1-13 22-25, 51:1-10). Catalano contradicts Wood from the start about Plaintiff's alleged deficiencies, if any:   *I think the -- the -- the ground operations went okay; I'd say they went average.   Id.* at 50.   He recalls that there was a TCAS

event and testified that he does not think that really went the way Ellis wanted it to.   (Catalano

Dep., Exh. 19, at 50:9-12). Later, he describes "another mistake that we both made," which is

that they missed the 18,000 foot transition altitude, but explains how they nonetheless landed

the plane safely in Grand Junction.   (Catalano Dep., Exh. 19 at 51:6-9)

S.  On March 10, 2016, Strickland told Plaintiff, who was ill, to go home and get some rest, so

Plaintiff flew home to Virginia. When he arrived, he discovered that he was actually scheduled

for training the next day, so he had to fly back, even though he was sick. Plaintiff alleges that

Davis was given time off and that he should have given Plaintiff time off as well. (Williams

Dep., Exh. 6, at 321:8-14 19-22; Strickland Dep., Exh. 12, at 149:2-14).

T.  On March 16, 2015, for the second check ride or QLEO 2A, in Mark Rosenhahn's Evaluator

deposition, he states multiple deviations from the AQP check ride procedures that created

additional obstacles for the Plaintiff.   These include missing briefing materials for a rarely

utilized QLOE 2A simulation and Captain seat fill-in, Renfro, did not attend the briefing.

Specifically, the following disputed facts reveal that this check ride was irregular and a pretext

for discrimination based on race, color and national origin:

1.  His seat fill partner Renfro did not attend the briefing – which is mandatory – even though

check rides start with a briefing.   (Rosenhahn Dep., Exh 21, at 177:11-14; Williams Dep.,

Exh 6, at 220:16-18).   Plaintiff wanted the briefing to discuss and consider, the operational

flight plan, discuss the weather conditions and alternative airport options (See Williams

Dep. 220-21).   The AQP and established United procedures require a pre-flight briefing:

"An instructor or evaluator may serve as a substitute crewmember.   The instructor or

evaluator should not allow previous knowledge of the scenario to influence or direct the

outcome of the evaluation." (AQP Training Guidance, Exh 5, at § 3.2,18).

2.  This check ride featured rarely used QLOE2A was missing briefing materials including multiple powerpoints of other QLOE's, so a 2013 UPS Airbus crash case study was utilized as substitute (Rosenhahn Dep., Exh 21., at 179:17-25, 180:1-12).

3.  Renfro, while flying, made two major errors, first "put the airplane in open descent…the airplane will not honor the constraints" then by flying 200 feet below the constrained fix, but Rosenhahn held this against Plaintiff. (Rosenhahn Dep., Exh 21, at 134:24-25,135:1-4; Williams Dep., Exh. 6, at 244:3-9).   The AQP states "While performing as support pilot, the pilot's actions should meet the criteria of "Expected Performance" or better (AQP Training Guidance, Exh 5, at § 3.2,2).

4.  When Plaintiff was flying and they were trying to land the plane, Renfro called "500 early" at 700 feet which is not a standard call, not standard operating procedure, impermissible in an LOE evaluation, and was confusing to Plaintiff.     500 early is not SOP and Rosenhahn does not know whether it is permitted in the training manuals (Rosenhahn Dep., Exh 21, at 231:20-25; John Dec, Exh 3, ¶ 2,11).

5.  With Plaintiff flying, Captain Renfro, said, "Runway is not in sight" and then seconds later also said "go around." Plaintiff testified that he followed proper procedures in this situation and had already powered up and was going around after hearing Captain Renfro Monitoring (Williams Dep., Exh 6, at 230:18-25).   Plaintiff executed the missed approach consistent with Instructor Manual (319/320 United, *Instructor Manual Management Chapter 1 Overview (QLOE 2A/2B),* Exh. 22, 76*).*

6.  Plaintiff claims that he did not go below minimums but Rosenhahn claims he did. (Rosenhahn Dep., Exh 21, at 9:4-5).

7.  Plaintiff testified that Rosenhahn told United representative Bryan Wright: "I intentionally gave him a decent to 4000 to jam him up. I expected him to drop the gears to slow down but instead he used the Thrust levers and the speed brake and just barely made it." (Williams Dep., Exh 6, at 244:10-15); Rosenhahn later testified that does not recall saying this and does not "believe" it is accurate. (Rosenhahn Dep., Exh 21, at 226:13-19).   This is obviously important, if not material, as possible direct evidence of discrimination.

8.   Rosenhahn told Plaintiff that the FAA was going to send a representative to watch the evaluation, which is highly unusual. The FAA has never sent a representative in the 20 years that Rosenhahn has worked in his position and the purpose for the FAA's direct involvement remains unclear. (Rosenhahn Dep., Exh 21, at 74:1).

U. No FAA officials witnessed or recommended any of the adverse actions against Plaintiff; everything was done by United employees. (Williams Dep., Exh 6, at 282:19-24).

V. Submitted is a recording of a United conference call in 2016 (Un-named United Supervisor Voice Recording, Exh. 27) where a supervisor is articulating a policy of lying in depositions.

W. Plaintiff did not make further reports of discrimination and harassment after his early February report to Strickland, because his first report had not helped and he did not think making subsequent reports would assist him. Accordingly, he was trying to "cooperate and graduate." He was the only one fired out of 22 trainees in his group. (Williams Dec., Exh 29, ¶ 10-12).

X. United revised its Pilot Proficiency Policy after Plaintiff left in apparent attempt to retroactively justify the actions it took to terminate Plaintiff's and others employment.   All three versions, with the additions in revision underscored, are attached as Exhibits 28, 29, 30.

## III. RESPONSE TO UNITED'S STATEMENT OF UNDISPUTED MATERIAL FACTS

There are many disputed factual issues and Defendant's representatives' testimony is rife with inconsistencies among its representatives.   It is hard to imagine a case in which a trier of fact is more important, than this one.   Responding to Defendant's general points:

1.  Plaintiff testified that he performed adequately on all training activities, including the check rides.  He denies most of Defendant's factual and subjective criticisms and there is no objective evidence of what happened.   The check ride instructor and seat fill are United employees, not true FAA representatives (Williams Dep., Exh. 6, at 218:5-8).

2.  Plaintiff 's deposition testimony provides evidence to support his hostile work environment allegations (including about the Watermelon Slurpee and gentle giant), and the bias on the part of Taylor, Wood and Rosenhahn.   He explains how his performance on each of the disputed check rides was actually adequate.   He describes the physical manifestations of his discomfort with Defendant's discriminatory treatment.   His testimony is consistent with his complaint allegations.   (Williams Dep., Exh. 6, at 130:4-7; 132:18-24 133: 8-16 134: 5-12).   See also Plaintiff's Supplemental Response to Interrogatory No. 6, in which all of his allegations are explained.

3.  Plaintiff reported harassment and discrimination to Rob Strickland, calling him right after the discriminatory encounters with Taylor.    "I explained everything to him with respect to what was said to me in the brief room in front of Mr. Davis. And pardon me, Mr. Strickland said, "No, no instructors are allowed to speak to the students like that." (Williams Dep., Exh. 6, at 145:4-5).   Plaintiff later complained to Brad Halloran. He had

16

no opportunity to complain about the pretextual failure on the second check ride, because he was terminated instead of being given more training as advertised, on March 16, 2016.

**Responses to Enumerated Paragraphs in Defendant's Statement of Facts**

1, 3, 4. The facts contained in paragraphs 1, 3 and 4 are undisputed, but not material.

2.   In Paragraph 2, United brings up an incident in Plaintiff's piloting history in 2014, which is not material because United hired him despite knowing of the incident, and because Plaintiff was cleared of regarding this incident, by the FAA.   Plaintiff has a clean record after 11 years of flying but instead of giving him the benefit of the doubt for long history and experience, try to use it against him.   Plaintiff explains how he handled this emergency situation proficiently in his deposition (Williams Dep., Exh 6, at 80:18-25 81-87:1-25; Letter from Federal Aviation Administration to Ellis Angelo Williams, Response to Letter, Exh.24).

5-6.   Plaintiff DENIES that he needed two extra days of LOFT training and asserts that he did not actually get a chance to fly during the additional trainings, each of which are material disputes. This list is otherwise undisputed but not material, perhaps added to convince this Court that discrimination did not occur.   *See Plaintiff's Statement of Facts, ¶ R.*

8. *See Plaintiff's Statement of Facts, ¶ A.* Taylor denies that he bought a watermelon-flavored Slurpee whereas Plaintiff testified to that in deposition. (Williams Dep. Exh. 5, at 130:4-7), denied by Taylor, (Taylor Dep., Exh 7, at 117:1-12).

9-10. *See Plaintiff's Statement of Facts, ¶ D.*

11.   Taylor told Plaintiff he would allow Davis to go first was because he knew Davis would pass and was not sure if Plaintiff would pass.   Taylor's announcement of his prejudice against Plaintiff and his "heavy accent" reveals his intent to discriminate against Plaintiff based upon his race and national origin, according to Plaintiff, whereas Defendant's representative Taylor denies any intent

to discriminate but instead claims to have let Davis go first to allow Plaintiff more time to test (and hopefully pass) (Taylor Dep., Exh 7, at 124:16-25, 125:1-6).   This denial directly contradicts the context of Taylor's comments – a reference to Spanish national origin and "heavy accents" when talking of what were asserted as similar persons who allegedly failed in the past.

12.   There are plenty of disputed facts regarding Taylor's discriminatory treatment of Plaintiff, including the Slurpee incident, the racial rant, and other aspects of Taylor's open display of discriminatory animus toward Plaintiff and passing his prejudice along to others.   *See Plaintiff's Statement of Facts, ¶ C-I.*

13-14. Plaintiff does not dispute the successes detailed in these paragraphs.

15. What really occurred in the February 17, 2016 full flight simulator ("FFS") ride is in dispute. Plaintiff' testified that Ziegler told him only that "I think it will be good for you," to do additional training and said nothing about the many claimed shortcomings in their debrief after the ride. Ziegler could only recall a spelling error in his deposition, but had to otherwise rely on what he wrote in his report (Ziegler Dep., Exh 10, at 70:1-8, 82: 9-13). Plaintiff did not see any of the Additional Training Reports, until litigation.

Plaintiff testified that none of what Ziegler wrote on the Additional Training Report happened, and that Ziegler discriminated against him by making up reasons for recommending extra training and not sharing them with Plaintiff.   (Williams Dep., Exh. 6, at 159:9-15).   *See Plaintiff's Statement of Facts, ¶L-N.*   Plaintiff denies the factual assertion that, on February 21, 2016, he had trouble "not flying in the (flight director) while hand-flying."   (Williams Dep., Exh 6, at 170:6-12).   The training session with Schuster and Prewitt were warm-ups, which normally would not be subject to evaluation and documentation. (McCaskey Dep., Exh. 26, at 153:10-16).

18.   There is a disputed issue of material fact regarding which of United's policy manuals should be used to evaluate Plaintiff.   Plaintiff contends that he passed both check rides according to the criteria set forth in the FAA approved AQP manual, and that this manual controls.   Defendant appears to justify its actions by referencing the "Enhanced Pilot Proficiency Policy" (Enhanced Pilot Proficiency Policy dated 1 Sep 2014, Exh. 28)   but also cites a "Probationary Pilot Policy" (Probationary Pilot Proficiency Policy dated 2 Nov. 2014, Exh. 29).    Of course, this dispute is material because pretext in discrimination cases may be established by pointing out inconsistencies in the following of policies and procedures.

19-20.   *See Plaintiff's Statement of Facts, ¶Q.*    Plaintiff was not informed of the panel on February 23 and accordingly, could not attend nor send anyone there on his behalf.   There was no union representative there because Plaintiff was not yet a member of the Pilot's Union.   Everyone was with United's management or human resources.   To say that everyone there is there to represent the pilot is, at best, lip service.   (Strickland Dep., Exh. 12, at 142:8-9 21-22).

21.   It is true that, after enduring the racial slur in the form of a watermelon Slurpee, bearing witness to Taylor's racial rants and admitted prejudice against Plaintiff, being held back in his training program with little logical explanation, and being called back to resume training a day after flying back to his home in Virginia from Denver even though United knew that he was sick, Plaintiff's confidence was rattled (Williams Dep., Exh. 5, at 321:8-14 19-22).

22. 23, 26. *See Plaintiff's Statement of Facts, ¶¶ P, Q.*   Plaintiff was given additional training sessions on March 5 and 6, but he was never permitted to fly in those sessions. A jury should be permitted to determine if Defendant's claimed efforts to help Plaintiff are a pretext for discrimination.

24.   It is undisputed that Plaintiff was allowed to advance after the March 7th, 2019 training. United did not document this favorable event for Plaintiff, although training events are supposed to be documented. Mike McCasky, Director Flight Training Flight Operations in his deposition on Page 153, cannot explain why there no written report or worksheet about that training (McCasky Dep., Exh. 26, at 153:3-5)

25. Whether the FAA "failed" Plaintiff is a disputed issue of material fact.  *See Plaintiff's Statement of* Facts*, ¶ U.*

27-29.   Plaintiff disputes having any problems with ground ops, and disputes almost all of the other claimed problems that led to Wood failing him on the check ride.  *See Plaintiff's Statement of Facts*, ¶ R. Catalano, the seat fill pilot on the March 8th ride, does not remember that Plaintiff had any problems other than that he reautomated a little to early.   See (Catalano Dep., Exh 19 at 50:7:13). *See Plaintiff's Statement of Facts, ¶R,* above.   Plaintiff claims he numerically passed this check ride based on AQP Difficulty Equivalency (AQP Dev. Process, Exh. 5, at § 2.0, 12, FR1-FR3)

United had the ability to monitor this and other simulator training sessions yet chose to not turn on the monitoring. (Wood Dep. 197:19-24, 199:16, 199:19, 200:9-11).   Yet another sign of irregularity is the fact that the scoresheet that Wood was supposed to turn in for this allegedly failed check ride, is missing. The ultimate determinant of whether a pilot passes or fails a check ride is the score (Wood Dep., at 166:8-9).

30.   Plaintiff was not invited to any review panels, and the review panel discussed him without having any independent way of verifying the evidence presented against Plaintiff.  *Plaintiff's Statement of Facts, ¶ Y.*

Plaintiff admits that he had a brief (around 10 minutes) meeting with Strickland and McCasky and did not again bring up discrimination, during that meeting. Plaintiff's Dep. 214-15. At this point, Plaintiff was reluctant to bring up further complaints because it had not helped him to complain and was trying to "cooperate and graduate."   (Williams   Dec., Exh. 26   ¶ 11).

32. -33.   *See Plaintiff's Statement of Facts, ¶ U* for a full list of the irregularities and disputed issues of fact, regarding of the second check ride, from which a jury may infer discrimination. Most importantly, Plaintiff denies going below minimums, which is the main asserted reason for failing him on the check ride:

```
Q.   So do I understand your position is
 4   that this busted ride was Renfro's fault because he
 5   said "500 early"?
 6           A.   No.   The ride wasn't a bust.   The bust
 7   was fabricated.   I didn't bust the ride.
 8           Q.   Because you didn't go below minimums?

 9       A.   Exactly.
```

(Williams Dep., Exh. 5, at 234:3-9).   Line Check Pilot Richard John confirms that calling "500 early is not SOP and should not be used in a check ride.   (Richard John Dec. ¶ 11).   Another dispute is whether the FAA failed Plaintiff, as Defendant claims, or whether that is not true because no FAA representatives witnessed any part of his training (Williams Dep., Exh 6, at 281:19-24).

35.   Defendant claims that Rosenhahn and Renfro's reports regarding the second check ride are consistent with one another and prepared close to the time of the event.   The issue of whether these check ride reports were the subject of fabrication and/or inappropriate corroboration must be evaluated by a jury and is critical, because this is Defendant's claimed legitimate reason for termination.   According to Plaintiff, Rosenhahn and Renfro kept him waiting in the debriefing room for "probably about an hour," before debriefing him, which was more than a sufficient

amount of time to jointly document the event in a manner as to appear consistent with one another. (Williams Dep., Exh. 6, at 234:12-25).

36. Plaintiff was in shock after the fabrications that led to his second failed check ride, was later told to report for more training, then when he reported he was terminated instead of given the promised additional training.   He did not have a chance to complain about the new incidents of discrimination because he was terminated without warning.

37. In paragraph 37, Defendant presents a list it acquired *via hearsay* – some unnamed pilot to Ben Salley to United – of claimed personal circumstances of Plaintiff.   The contents of paragraph 37 do not constitute admissible evidence and so may not be offered in support of a motion for summary judgment. F.R.C.P. 56(c)(2). Plaintiff denies that he was distracted by personal events during training.   (Williams Dep., Exh. 6, at 153:15-20).

38. Plaintiff did not learn of any of the panel events until after he was terminated and of course, was not there to defend himself in the March 21, 2016 panel in which it was decided that he would be terminated.   Plaintiff never even met anyone on the review panels, other than Strickland. (Williams Dep., Exh 6, at 285:1-21, 287:1-2, 289:6-8).

39.   In 39, Defendant cites McCaskey's deposition on why Plaintiff failed. Whether Plaintiff "failed to progress" is directly disputed by Plaintiff and is material because it pertains to his discrimination prima facie case, and pretext.

40-43.   These paragraphs raise disputed issues of material fact including whether the alleged failures in the check rides actually happened, whether they were the true reason for terminating Plaintiff, and what, if anything, Plaintiff is responsible for regarding the check ride issues.

44. 44, 47, 48 and 50.   These paragraph numbers describe isolated statements taken from Plaintiff's deposition in attempt to unfairly characterize and limit his testimony and the evidence in general, regarding the discrimination and harassment he endured and his reports thereof.

    A. While Plaintiff did identify discrimination on the following dates:   January 30-31, February 3-4, 17, 20-21, March 5-6, 8 and 16, 2016, this list is incomplete and mischaracterizes the testimony in at least the following ways:

        1. Plaintiff identifies an earlier incident – when his partner Davis makes a derogatory comment – that is not included in this list. (Williams Dep., Exh. 6, at 124:15-25; 125: 1-4 11-13).

        2. Deposition testimony by Ziegler, Taylor and Strickland each reveal evidence that Defendant emailed or otherwise transmitted, information about Plaintiff in advance of Plaintiff's encounter with a new instructor or phase of training, and Plaintiff does not have first-hand knowledge of all of what was said in those communications but has reason to believe that some were discriminatory, two examples of this being:

            a. the fact that Strickland sent an email to Mauch about his supposed shortcomings after Plaintiff passed procedures validation (Response to Statement of Facts, No.9-10, above)

            b. Wood's testimony suggests that he had made up his mind to fail Plaintiff even before the check ride began.

        3. Plaintiff has explained his offense to the "gentle giant" comment and how it is discriminatory, in Supp. Response to Interrogatory No. 6, p. 6.

4.   Plaintiff was asked if he knew of discrimination in any other phases of the

training and he answered no.   Plaintiff did NOT testify that no other

discrimination occurred, and he was not privy to the many internal emails and

conversations about him that were admitted in various United representatives'

depositions.

Plaintiff explains how being separated from his training partner put him at a disadvantage:

**3. I understand that at some point you**
**4   believed -- I'll tell you my understanding, and then**
**5   you can tell me if I'm wrong or right. I don't mean**
**6   to butcher your words -- that you believe separating**
**7   you from Mr. Davis was discriminatory; is that right?**
8         A.   Yes.
**9         Q.   Please tell me why you believe that.**
10         A.   Because the intent was if Mr. Davis and
11   I went through with our check ride, there would not
12   have been a separation.   As a result of that, when I
13   have -- when anyone has an instructor as opposed to an
14   actual pilot who's going through with a check ride, it
15   means that the instructor can mess up as much as he or
16   she wants.   And there's no penalty to that person.
17   Just like Mr. Renfro did on many occasions, and there
18   was no penalty.   I'm a new-hire, and I'm basically
19   expected to babysit Mr. Renfro.

(Williams Dep., Exh. 6, at 275:10-19). The Declaration of Michael Kabbah is independent

evidence that can be used by a jury to infer discrimination from the separation of a trainee from

his partner.

49. *See Plaintiff's Statement of Facts, ¶ J.*

51. United's statistics on probationary pilots are not good: those who are washed out of the program

are disproportionately Black or other minority as compared to the total number of pilots employed

and their respective classifications.   See, 2017 email from Strickland (Exhibit 30) and

Demographic Summary (Exhibits 31).   These documents have been designated "confidential" by

United and so will be filed and served conventionally, pursuant to the applicable protective order.

## IV. ARGUMENT

### A.  Standard of Review

Summary judgment may be granted only if the Defendant has shown that there is no genuine

dispute as to ANY material fact and that Defendant is entitled to judgment as a matter of law.

F.R.C.P 56(a).   All inferences must be resolved in favor of Plaintiff, the non-moving party, so that

if Plaintiff produces evidence of a dispute of any fact material to the elements of his claims, then

summary judgment must be denied.   See F.R.C.P. 56 (a), (c); *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).

Defendant moved for summary judgment on all four of Plaintiff's remaining claims[3] and

bears the burden of showing that Plaintiff has failed to establish any of his claims based upon the

evidence collected so far.   F.R.C.P. 56(a), (c);     *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).    Summary judgment is often inappropriate in discrimination cases like this one, because

"[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a "mini

trial" to determine the defendant's true state of mind."    *Randle v. City of Aurora*, 69 F.3d 441, 453

(10th Cir. 1995).   So long as the plaintiff has presented evidence of pretext, the case should go to

trial.  Judgments about intent are best left for trial and are within the province of the

---

[3] FIRST CAUSE OF ACTION - Discrimination and Retaliation, Race and National Origin, Title VII
SECOND CAUSE OF ACTION -Discrimination Based on Race §42 USC 1981
THIRD CAUSE OF ACTION -Discrimination and Retaliation Based on Race and National Origin, Colorado Anti-Discrimination Act (CADA)
FOURTH CAUSE OF ACTION- Hostile Work Environment

jury. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).   See also *Brown v. Parker–Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir.1984) ("where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment.").

### B. Summary Judgment Should Be Denied on Plaintiff's Discrimination Claims

### 1. Plaintiff Has a Prima Facie Case for Discrimination

"Title VII makes it unlawful 'to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' " *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (quoting 42 U.S.C. § 2000e–2(a)(1) ).   Plaintiff's Title VII, s CADA and § 1981 claims are analyzed under the same framework as Title VII claims.   To establish a *prima facie* case of discriminatory dismissal based on race or national origin, plaintiff must show: (1) he is a member of a protected class; (2) he was discharged; (3) he was qualified for the position at issue; and (4) he was treated less favorably than others not in the protected class. *Khalik,* 671 F.3d at 1192. The first elements of the prima facie case are undisputely satisfied:   Plaintiff is a member of two protected classes, being Antiguan (National Origin) and Black (Race), speaks with a noticeable accent, and was discharged.

Regarding the issue of whether Plaintiff was qualified for the position, Plaintiff presents the following undisputed facts:

1. Plaintiff already had 11 years of commercial pilot experience before being hired by United;

2. Plaintiff passed all the phases preceding the check rides;

3. Plaintiff disputes the asserted facts about why he failed the check rides and claims he should have passed.   *Plaintiff's Statement of Facts, ¶ ¶ S and U.*

These facts, by themselves, should be enough to establish that Plaintiff was qualified for purposes

of a prima facie case of discrimination.   The burden imposed on a plaintiff at the prima facie stage

is 'not onerous.'   *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089,

67 L.Ed.2d 207 (1981)). *See also Ortiz v. Norton,* 254 F.3d 889, 894 (10th Cir. 2001).

Defendant claims that a prima facie case is not established because Plaintiff was "not

qualified," citing its claimed reasons for termination.      In many discrimination cases, an employee

is terminated for claimed performance reasons yet may still have a case for discrimination because

those reasons are pretextual.   For this reason, courts in this Circuit have held that a *defendant may*

*not defeat a plaintiff's prima facie case by articulating the reasons for the adverse employment*

*action.      EEOC v. Horizon CMS*, at 1193, *citing Burrus v. United Tele. Co. of Kan,* 683 P. 2d 339,

341-42 (10th Cir. 1982).

> *Short-circuiting the analysis at the prima facie stage frustrates a plaintiff's ability to establish that the defendant's proffered reasons were pretextual ...; if a plaintiff's failure to overcome the reasons offered by the defendant for discharge defeats the plaintiff's prima facie case, the court is then not required to consider plaintiff's evidence on these critical issues.*

*Id., quoting MacDonald v. Eastern Wyo. Mental Health Ctr.,* 941 F.2d 1115, 1118–21 (10th

Cir.1991).   Following that logic, United may not defeat the prima facie case by claiming Plaintiff

was not qualified because the evidence set forth in Section 2 below must be evaluated by a jury.

Similarly, a court may not allow a Defendant to define how a plaintiff satisfies the

"similarly situated" element of the prima facie case.   A plaintiff alleging discrimination in

violation of Title VII can satisfy the fourth element of the prima facie case in a number of ways.

*See Perry v. Woodward,* 199 F.3d 1126, 1140 (10th Cir.1999), *cert. denied,* 529 U.S. 1110, 120

S.Ct. 1964, 146 L.Ed.2d 796 (2000).   Defendant did not present any argument on the issue of

whether Plaintiff was treated less favorably for PFC purposes.   Plaintiff offers the following facts on this element:

1. Plaintiff was similarly situated to his partner Davis and other non-Black classmates who also were training for the right seat of the A320 and subject to the same systems, procedures, maneuvers and flight validation testing as Mr. Williams with all trainees working under the supervision of Mr. Strickland. *Plaintiff's Statement of Facts, ¶ D.* However, as compared to his peers training for the right seat of the A320, Mr. Williams was subject to less favorable, disparate treatment – he was not provided a trainee as his simulation partner but rather placed at a disadvantage in being paired with an instructor as a "neutral" captain in the left seat. *Plaintiff's Statement of Facts, ¶ N.*   He dissimilarly was subject to the criticisms of two rather than one instructor and provided no team assistance setting him up to fail in having to man both seats; *Statement of Facts ¶ N.*

2. Plaintiff was the only person fired from his class of 22 trainees; (Email Strickland to Oliver 12 Feb 2017, Subject: Separations, 12 Feb 2017 23:34, Exh. 31).

3. Defendant treated others of African descent differently than the Caucasian candidates, as may be inferred from the combination of Plaintiff's testimony and that of Declarant Michael Kabbah. (Kabbah Dec, ¶ 8-14, 19-20).

Defendant points out that two African-American pilots passed their training, but this does not determine whether Plaintiff can establish a prima facie case because Plaintiff is not required to establish that ALL Black trainees were treated less favorably than non-black employees.

Plaintiff also claims national origin discrimination, and he and Kabbah both are Black and speak with foreign accents (Kabbah Dec,, ¶ 2) Taylor began the discrimination against Plaintiff by subjecting him, in the presence of Davis, to a rant about how four people with heavy foreign

accents failed since he has been working there, debriefed him even though Plaintiff passed and then Taylor spread his bias to others. *Plaintiff's Statement of Facts, ¶ ¶ C-E.* These facts, if proven, show that Plaintiff was treated less favorably than others who are not in a protected national origin class.

### 2.     Defendant's Proffered Termination Reason is Pretext for Discrimination

Having established a *prima facie* case of national origin and race discrimination and/or retaliation, the burden shifts to Defendant to articulate a legitimate nondiscriminatory reason for the decision to require that Mr. Williams to resign or terminate his employment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973). To meet this burden, Defendant stated that its decision to terminate employment was based solely on Mr. Williams failing two QLOEs (check rides) after receiving five additional trainings. Then the burden shifts to Plaintiff to demonstrate that the asserted reason for termination is pretextual, from which a jury may infer that the true reason for termination is discrimination.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) "Pretext exists when an employer does not honestly represent its reasons" for its adverse employment action. *Miller v. Eby Realty Group LLC,* 396 F.3d 1105, 1111 (10th Cir.2005). Plaintiffs may present various types of evidence to establish pretext, *e.g.* a defendant's failure to follow its own policies, procedural irregularities, use of subjective criteria in the decision, that plaintiff was treated differently than similarly situated employees. *See Riggs,* 497 F.3d at 1119; *see also McDonnell Douglas,* 411 U.S. at 804-05 (discussing methods of

proving pretext, including disparate treatment and statistical evidence).   A plaintiff need not offer any direct evidence of actual discrimination to show pretext. *Timmerman,* 483 F.3d at 1113. When assessing if plaintiff has made an appropriate showing of pretext, courts must consider the evidence as a whole. *See Washington v. Davis*, 426 U.S. 229, 242, 48 L. Ed. 2d 597, 96 S. Ct. 2040 (1976) ("An invidious discriminatory purpose may often be inferred from the totality of the relevant facts.").

Plaintiff disagrees with THE FACTS asserted by the instructors who failed him on the check rides.   Defendant's citation of *Kelly v. Goodyear* and other cases holding that plaintiff's SUBJECTIVE evaluation of his performance does not establish pretext is not valid, because Plaintiff here disputes many objective factual assertions regarding his performance, ECF 86, p. 24).   *Plaintiff's Statement of Facts, ¶¶ M, R, T.*

The following material facts are disputed and if proven, will establish that Defendant's asserted reason for termination is pretextual:

1.  Events evidencing animus against Plaintiff based upon his race and national origin (Watermelon Slurpee, gentle giant comment, racial rant of Taylor, treatment during training, spreading the word); *Plaintiff's Statement of Facts, ¶¶ C-I.*

2.  Defendant's deviation from the AQP and other policies and practices:   separating Plaintiff from his training partner, giving Plaintiff extra (but meaningless) training, not sharing alleged problems during debriefings, convening panels to decide his fate without including him or providing any objective evidence for the panel members; *Plaintiff's Statement of Facts, ¶ N, Q, R, T, Y.*

3. United had the ability to collect data regarding what actually happened during the check rides it relied upon to terminate Plaintiff's employment, yet either did not collect that data or destroyed it; *Exh. 2; Plaintiff's Statement of Facts, ¶ Y.*

4. The following facts re the first check ride:

   - Whether ground ops was patchy (Wood Dep., Exh. 18, at 186:16-17), compare (Williams Dep., Exh. 6, 202:11-17 20-25 5, 203:1-9, 208:23-25)

   - Did f/o missed bleeds switches during pneumatic start (Wood Dep., Exh 18, at 188:8-24, 190:10-11), compare (Williams Dep., Exh. 6, at 209:3-8)

   -  Wood said Plaintiff turned off APU generator but Plaintiff denies that (Wood Dep., Exh 18, at 190:10-13); Compare Plaintiff's Dec. ¶ 9.

   - Plaintiff claims he did not have advocate for himself when ATC gave a clearance to line up and wait because he was ready for take off, but Wood said he should have (Wood Dep, Exh. 18, 191: 8-11), compare (Catalano Dep., Exh 19, at 90:24-25, 91:1-5).   Williams Dec. ¶   9.

   - Whether Plaintiff did anything improper re the TCAS event- xh 18, at 204:22-25,205 1-17), compare (Williams Dep., Exh. 6, at 208:4-10).

5.  The score sheet for Plaintiff's first check ride is missing, and the score is admittedly critical to determining if someone passed or failed the check ride.   *Plaintiff's Statement of Facts, ¶ R.*

6. The eight factual disputes and irregularities set forth in *Section T of Plaintiff's Statement of Facts* regarding the second check ride, including whether Plaintiff went below the minimum altitude, whether Rosenhahn deliberately tried to jam him up, whether the 500

early call was permissible, and whether it was permissible to fail Plaintiff considering that he was not permitted to have a proper briefing before the second check ride;

7. Miscellaneous lies and inconsistencies: saying the FAA was going to come then saying that they are not, then someone for the FAA as actually there to do the debriefing, on his second check ride Ellis was blamed for errors that occurred while his partner was flying. *Plaintiff's Statement of Facts,* ¶ ¶ *M,R,T,U.*

8. United revised its Pilot Proficiency Policy after Plaintiff left, in apparent attempt to retroactively justify the actions it took to terminate Plaintiff's employment. *Plaintiff's Statement of Facts,* ¶ *X.*

9. United's statistics suggest that a vastly disproportionate number of the candidates who wash out of the training program, are Black.   See Response to Statement of Facts, No. 51.

Summary judgment should be denied and Plaintiff's discrimination claims should be permitted to go forward, because there are disputed issues of material fact sufficient to allow Plaintiff to prove his prima facie case and pretext and based upon which a jury could infer that his termination was due to his race or national origin.

**C.  Summary Judgment Should be Denied on Plaintiff's Retaliation Claims**

The general approach to Title VII suits set forth in *McDonnell Douglas Corp. v. Green* applies to retaliation claims under Title VII, CADA and Section 1981.   *See Love v. RE/MAX of America, Inc.,* 738 F.2d 383, 385 (10th Cir.1984). The plaintiff must first set forth a prima facie case of retaliation by establishing (1) protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal connection between such activity and the employer's adverse action. *Id.* (citing *Burrus v. United Tel. Co.,* 683 F.2d 339, 343 (10th

Cir.), *cert. denied,* \*986 459 U.S. 1071 (1982). Once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the defendant presents evidence of a legitimate business reason, the plaintiff must then be allowed to demonstrate that the defendant's offered reasons are a mere pretext for discrimination. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985–86 (10th Cir. 1996).

Plaintiff can establish a prima facie case for retaliation:

1. Plaintiff engaged in protected opposition by reporting all of what Taylor said to Plaintiff on February 4, 2016, to Human Factors representative Strickland. *Plaintiff's Statement of Facts,* ¶ *J.* After this report, Strickland sent an email to the instructor staff including Plaintiff's next instructors, listed the problems that Taylor claimed to have with Plaintiff even though Plaintiff had passed the procedures validation with Taylor and had reported Taylor's harassment and humiliation of him, to Strickland.   *Plaintiff's Statement of Facts,* ¶ *J.* Plaintiff felt that Taylor's actions were based upon race and a jury could find that Plaintiff's call to Taylor on February 4, 2016 constituted a good faith report of harassment based on race discrimination. (Williams Dec. ¶ 6).   Plaintiff's case got the attention of the Black Pilots Union and at least one letter of support was written for Plaintiff, by Black pilot Richard John.   This letter may also be a basis for retaliation against Plaintiff. (Exh. 3, Attachment to John Declaration)

2. After the report, Plaintiff experienced adverse actions, including being held back and separated by his training partner by Ziegler, failed on irregular check rides by Wood and Rosenhahn with fabricated or at least exaggerated issues, and ultimately being terminated. *Plaintiff's Statement of Facts,* ¶¶ J,K,L,M,N,Q,R,T.

3. Plaintiff can establish a causal connection:   after he reported Taylor's statements and conduct to Strickland, the pressure on him intensified as Strickland continued to spread misinformation about Plaintiff to the instructor team via electronic mail, and otherwise. *Plaintiff's Statement of Facts, ¶ J* and Williams Dec., ¶ 6-10.

4. Defendant should not be permitted to use the hearsay statements of what Captain Sally supposedly reported, to defeat summary judgment (Defendants' SOF 37). F.R.C.P. 56(c)(2).

The factual disputes listed in section 2 above apply to allow Plaintiff to prove pretext and that his termination was in retaliation for engaging protected activity.   Accordingly, Plaintiff has established that there are sufficient disputes of material fact to prove a prima facie case for retaliation and pretext, so summary judgment should be denied his retaliation claims.

### D.  There are Disputed Issues of Material Fact Regarding Plaintiff's Hostile Work Environment Claim.

To establish a hostile work environment claim under 42 U.S.C. § 1981, Title VII (and CADA), a plaintiff must prove (1) the acts alleged are part of a hostile work environment and involve racial animus; (2) the harassment was sufficiently severe to alter the terms, conditions, or privileges of his employment; and (3) the employer's   response to the alleged harassment was inadequate. *Tademy v. Union Pac. Corp.,* 614 F.3d 1132, 1152 (10th Cir.2008). The question is whether a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Sandoval v. City of Boulder,* 388 F.3d 1312, 1327 (10th Cir.2004). The work atmosphere is viewed both objectively

and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position. Courts may consider the conduct's frequency and severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the plaintiff employee's work performance. *Tademy, supra at* 1144. The harassment must be based on the plaintiff's protected class or stem from discriminatory animus toward his protected class. *See id.* at 1139.

This court denied Defendant's motion to dismiss the hostile work environment claim because of the following alleged facts, now supported by evidence:

1. Flight Instructor Chuck Taylor purchased a watermelon-flavored Slurpee for Plaintiff and a cherry-flavored Slurpee for his Caucasian partner Cliff Davis and handed the watermelon-flavored Slurpee to Plaintiff; *Plaintiff's Statement of Facts, ¶ C.*

2. In early February 2016, Taylor told Plaintiff that he thought Plaintiff may not pass and that since Taylor has been here, four people with heavy foreign accents have failed. *Plaintiff's Statement of Facts, ¶¶ G-H.*

3. Taylor blamed Plaintiff for following Taylor's instructions, then invented claimed performance deficiencies and spread his bias to others. *Plaintiff's Statement of Facts, ¶¶ D-I.*

4. Brad Halloran told Plaintiff "I don't find any problem with you, you are just a gentle giant." *Plaintiff's Statement of Facts, ¶ F.*

5. Plaintiff was sickened by the harassment and discrimination, and he told his supervisor Strickland that he was sick, Strickland sent him home to Virginia then made him fly back to Denver the next day; *Plaintiff's Statement of Facts, ¶ S.*

The above facts show that the harassment of Plaintiff is based on his race and / or national origin and was severe enough to interfere with the terms and conditions of Plaintiff's employment, to the point where it sickened him.   The following facts show pervasiveness and severity:

6. Plaintiff was separated from his training partner Davis even though both passed procedures validation, and Plaintiff was required to do additional training but for most of the additional training days, Plaintiff was not allowed to fly and in one, he was written up in deviation from established procedures; *Plaintiff's Statement of Facts, ¶ ¶ N-Q.*

7. Defendants representatives Ziegler, Wood, Rosenhahn and Renfro deviated from established policies and procedures and deliberately created scenarios designed to fail Plaintiff and\or falsely claimed that Plaintiff failed in those scenarios; *Plaintiff's Statement of Facts, ¶¶ K-N,R,T.*

8. United broke its own policies and destroyed or deliberately failed to collect evidence that may have helped Plaintiff. *Plaintiff's Statement of Facts, ¶¶ N,O,Q,R,T.*

9. The third element, inadequacy of the employer's response, is satisfied to the extent that Plaintiff's situation got worse after he made his report to Strickland, *Plaintiff's Statement of Facts, ¶ J. and Plaintiff's Declaration.*

Summary judgment should be denied because there is sufficient evidence to establish a hostile work environment claim.   The conduct begins overtly racial, continues with Defendants calling Plaintiff out for errors that either did not occur at all or were much less grave than his training partner's (in the case of Davis), frequently deviating from their established policies and procedures in attempt to find a basis to fail Plaintiff, inventing processes uniquely designed for his evaluation and in departure from FAA guidelines, and deliberately trying to trick him and jam him up.   Facially neutral abusive conduct can support a finding of [racial] animus sufficient to sustain

a hostile work environment claim when that conduct is viewed in the context of other, overtly [racially]-discriminatory conduct." *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1097 (10th Cir.1999), which is proper here because the animus against Plaintiff started with overly discriminatory conduct.   Plaintiff has presented facts that, if proven, demonstrate that the conduct was based on animus against him due to his race and national origin, with sufficient severity, pervasiveness, and conduct that was objectively and subjectively offensive and interfered with the terms and conditions of his employment and was not remediated by his employer.

## CONCLUSION

FOR THE FOREGOING REASONS, Plaintiff respectfully prays that the Court deny Defendant's Motion for Summary Judgment on all claims, and award Plaintiff its reasonable attorney's fees and costs incurred in defending against this Motion.

Respectfully submitted this 26th day of July, 2019.

By:    *s/ Patricia S. Bellac*
Patricia S. Bellac (#22447)
PATRICIA S. BELLAC LAW FIRM, LLC
4845 Pearl East Circle, Suite 101
Boulder, CO 80301
Telephone:   303-442-5111
Fax:   303-417-6381
E-mail:   psb@psblawfirm.com
*Attorney for Plaintiff*

# CERTIFICATE OF SERVICE

This is to certify that on this 26th day of July 2019, a true and correct copy of the foregoing **RESPONSE TO MOTION FOR SUMMARY JUDGMENT** was served by filing electronically with the Court using the CM/ECF system which will send notification of the filing to the following:

Erin A. Webber, ewebber@littler.com
Michelle L. Gomez. mgomez@littler.com
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
*Attorneys for Defendant United Airlines, Inc.*

By:      s/Patricia S. Bellac