IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-01191-LTB-NRN

ELLIS WILLIAMS,

Plaintiff,

v.

UNITED/CONTINENTAL,

Defendant.

## REPORT AND RECOMMENDATION ON
## DEFENDANT UNITED AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT
### (Dkt. #86)

**N. Reid Neureiter**
**United States Magistrate Judge**

This matter is before the Court pursuant to an Order (Dkt. #89) issued by Judge

Lewis T. Babcock referring Defendant United Airlines, Inc.'s ("United") Motion for

Summary Judgment. Dkt. #86. The Court has reviewed the subject motion (Dkt. 86),

Plaintiff Ellis Williams' Response (Dkt. #99), United's Reply, (Dkt. #103), and Mr.

Williams' Sur-Reply (Dkt. #108). The Court heard oral argument on the subject motion

on August 14, 2019. *See* Dkt. #107. The Court has taken judicial notice of the Court's

file and considered the applicable Federal Rules of Civil Procedure and case law. Now,

being fully informed and for the reasons discussed below, I recommend that United's

Motion for Summary Judgment (Dkt. #86) be granted.

## I. BACKGROUND

This is an employment discrimination case. Mr. Williams alleges that during his

probationary pilot training with United, he experienced racial and national origin

discrimination. He asserts claims for discrimination and retaliation under Title VII, 42

U.S.C. § 1981, and the Colorado Anti-Discrimination Act ("CADA"), and for hostile work

environment. United now seeks summary judgment.

Based on the briefing and evidence submitted, the parties agree as follows,

unless noted. Where a dispute exists, the Court construes the facts most favorable to

Mr. Williams, the nonmovant.

Mr. Williams, who is black and of Antiguan descent, applied to be a pilot at

United in 2015. Dkt. #86 at 3, ¶ 1.[1] He was offered a position of First Officer upon the

successful completion of United's training program. *Id.* at 4, ¶ 4. Mr. Williams' training

had several components, including nine days of basic indoctrination training, seven

days of systems training, six days of procedures validation training, five days of

maneuvers training, six days of line oriented flight training ("LOFT"), four "warm-up"

sessions, and two qualification line oriented evaluations (a "QLOE" or "check-ride"). *Id.*

at 4–5, ¶ 5. While United contends that the six days of LOFT is two more than most

students need, *id.*, as discussed below, Mr. Williams states that he did not need the

extra training and, in any case, he did not actually fly during those additional sessions.

Dkt. #99 at 17, ¶¶ 5–6.

Mr. Williams' training was supervised by Rob Strickland, Senior Manager of

Human Factors and Pilot Development, who is black and who never acted in a

discriminatory manner towards Mr. Williams. Dkt. #86 at 5, ¶ 6. There were also two

---

[1] All page citations are to page number in the CM/ECF header, which does not always
match the document's internal pagination, particularly in exhibits.

other black probationary pilots in Mr. Williams' new hire class, both of whom passed their training and remain employed by United. *Id.* at 6, ¶ 7.

Mr. Williams' allegations of discrimination originate with the behavior of First Officer Chuck Taylor, who performed the procedures validation training. On January 31, 2016, First Officer Taylor brought Slurpee drinks to the first training session he had with Mr. Williams and his training partner, Captain Cliff Davis. *Id.* at 6, ¶ 8. Mr. Williams claims that he was given a watermelon-flavored Slurpee as "an intentional racial slur" because "the stereotype that African Americans are excessively fond of watermelon is a racist trope historically used for political purposes to denigrate black people[.]" Dkt #99 at 5, ¶ C. United disputes that First Officer Taylor bought or offered Mr. Williams a watermelon-flavored Slurpee, and instead asserts that he brought cherry, grape, and blue coconut-flavored frozen drinks[2] to the training. Dkt. #86 at 6, ¶ 8.

During the procedures validation training, First Officer Taylor observed that Mr. Williams had pacing issues, would stop responding, and would sit there "not doing anything." *Id.* at 6, ¶ 10. Mr. Williams claims that this criticism was unfair because Mr. Taylor instructed him to "just sit on your hands and watch." Dkt. #99 at 5, ¶ D. Mr. Williams also claims that First Officer Taylor told him, "So far, I know of four of people who have failed and got fired, three of which were Hispanic with heavy accents," which Mr. Williams believes is "per se evidence of national origin discrimination," considering Mr. Williams speaks English with a Caribbean accent. *Id.* at 6–7, ¶ G. First Officer

---

[2] There appears to be a factual dispute whether the frozen drink First Officer Taylor offered Mr. Williams was a Slurpee from 7-11 or a "slushie" (which appears to actually be called a "slush") from Sonic Drive-In. *See* Dkt. #103 at 20, ¶ C. This distinction is immaterial to the Court's analysis: as discussed below, the Court will assume Mr. Williams was given a watermelon-flavored Slurpee.

Taylor testified that he mentioned a previous student with a Spanish accent because he was trying to figure out if communication issues were causing Mr. Williams' pacing problems. Dkt. #103 at 14.

First Officer Taylor then said that Captain Davis, who is white, "isn't going to let [Mr. Williams] make him fail his check ride," and further speculated to Mr. Strickland that Mr. Williams was dyslexic because he mis-typed one of waypoints into the computer system. Dkt. #99 at 7, ¶ H. First Officer Taylor, who is dyslexic himself, testified that this was another attempt to diagnose the possible cause of Mr. Williams' performance problems. Dkt. #103 at 21–22.

Mr. Williams claims he called Mr. Strickland to complain about this treatment, but nothing was done about it. Dkt. #99 at 7, ¶ J. At First Officer Taylor's prompting, Mr. Strickland did give Mr. Williams some mental and physiological tips, after which his performance improved. Dkt. #86 at 6, ¶ 10. Mr. Strickland also reached out by email to First Officer Kevin Mauch, who was involved in Mr. Williams' maneuvers training, to assist Mr. Williams with his communication issues. Dkt. #99-11. Ultimately, Mr. Williams passed his procedures validation and maneuvers training. Dkt. #86 at 7, ¶ 13.

Despite First Officer Taylor passing him, Mr. Williams asserts that First Officer gossiped about his performance with other instructors, which influenced Mr. Williams' remaining training experience. Dkt. #99 at 7, ¶ I. For example, on February 3, 2016, First Officer Brad Halloran told Mr. Williams, "Ellis, I don't find there's a problem with you, I think you're just like a gentle giant." *Id.* at 5, ¶ F. In addition to finding this comment prejudicial and demeaning (Mr. Williams is 6'4" and 300 pounds), Mr. Williams

claims that it shows that Mr. Taylor's alleged biases were being passed on to other United personnel. *Id.*

Mr. Williams claims that his February 14–17, 2016 LOFT sessions with First Officer Todd Ziegler were similarly marred by First Officer Taylor spreading "the dirty low down" to other instructors.[3] *Id.* at 8–9, ¶¶ K–M. After Mr. Williams' fourth full flight simulator ("FFS") ride (the first three went fine), First Officer Ziegler wrote that Mr. Williams "[d]oes not accurately prioritize tasks" and "[d]oes not speak up with questions or concerns as often as he should." Dkt. #86 at 8 ¶ 15. Mr. Williams claims these criticisms were "foolish" and "preposterous," as well as discriminatory because his white training partner, Captain Davis, was not subjected to comparable reproaches. Dkt. #99 at 8, ¶ K. First Officer Zeigler scheduled Mr. Williams for two extra training sessions which Mr. Williams contends were not needed. *Id.* at 9, ¶ M.

After the LOFT sessions with First Officer Zeigler, Mr. Williams and Captain Davis were placed on separate crews. *Id.* at 9–10, ¶ N. Mr. Williams alleges that this was discriminatory because, per United's protocols, training partners were generally kept together, and without Mr. Davis, Mr. Williams "no longer had a comparator" to evaluate him against. *Id.* He also claims that his eventual pairing with an instructor, "as opposed to an actual pilot," harmed Mr. Williams' training because "there's no penalty" if an instructor performs poorly. *Id.* However, United claims that First Officer Ziegler recommended that First Officer Davis proceed to his check ride because he was ready

---

[3] First Officer Taylor states that the only instructor he spoke to about Mr. Williams was First Officer Halloran, and that was during the middle of procedures training, not after it. Dkt. #103 at 22. First Officer Ziegler denies speaking with First Officer Taylor about Mr. Williams. *Id.* at 23.

for the examination and "there was no reason to keep him behind to stay with Mr. Williams for his additional training." Dkt. #99 at 18, ¶ 46. United further points out that its Advanced Qualification Program ("AQP") provides that while "[[f]light crewmember substitution is highly discouraged since it distracts from realism and may inhibit good training and/or evaluations," it does not prohibit such substitutions when "necessary." *See* Dkt. No. 99-5 at 2–3. The AQP also allows instructors to serve as substitute crewmembers. *Id.*

Performance issues arose during Mr. Williams' additional LOFT rides. First Officer Greg Schuster noted in the Additional Training Worksheet that Mr. Williams' "major trouble point for today was not flying in the [flight director] while hand-flying . . .." Dkt. #86 at 8 ¶ 16. However, Mr. Williams points out that he passed this training exercise. Dkt. #99 at 10, ¶ O. Then, First Officer Dave Prewitt observed that Mr. Williams was "below standard in Ground operations to include Supplementary engine start procedures, Pushback/after start, re-routes and CRM [crew resources management]/TEM workload management." Dkt. #86 at 8 ¶ 17. Mr. Williams concedes that this report was made but responds that these "warm-up" sessions are normally not subject to evaluation and documentation. Dkt. #99 at 18.

As a result of Mr. Williams' alleged deficiencies, Mr. Strickland arranged for a probationary review panel to create a remediation strategy and plan. Dkt. #86 at 9, ¶ 19. Mr. Williams was not informed of the creation of this or any of the subsequent panels, and no one on the panel had direct knowledge of what happened during the FFS rides; instead, they relied on training logs and a briefing by Mr. Strickland. Dkt. #99 at 10, ¶ P. The panel determined that additional training was necessary, but Mr. Williams states he

was not allowed to fly during the three added sessions. *Id.* at 11, ¶ Q. Instead, he programmed the computer and was timed "loading the box," i.e., coordinating the flight plan. Dkt. #86 at 10 ¶ 23.

In any event, on March 7, 2016, First Officer Steve Renfro, who evaluated Mr. Williams' maneuvers training, recommended Mr. Williams for his check ride, which is the final stage of pilot training. Dkt. #86 at 10, ¶ 24. Check rides are Federal Aviation Administration ("FAA") examinations, meaning that the FAA, not United, establishes the relevant criteria, and each pilot must pass the exam to receive the necessary licenses, certifications, and endorsements. *Id.*, ¶ 25. While the evaluators are United employees, they are also designated representatives of the FAA and conduct the examinations on behalf of the FAA. Dkt. #86-2 at 6.

On March 8, 2016, Mr. Williams attempted his first check ride. *Id.* at 11, ¶ 27. The evaluator was Captain Dave Wood, a United employee since 1988, and First Officer Pete Catalano served as the captain ("captain seat-fill"). *Id.* Captain Wood did not pass Mr. Williams. *Id.*, ¶ 28. He noted several problems, including, "Ground ops was patchy," "missed bleeds switches during pneumatic start," "turned off APU gen . . . and turned on max autobrakes," "did not advocate for himself" while taxiing out, and reacted inappropriately to a traffic collision avoidance system ("TCAS") event. Dkt. #86-27 at 2. Mr. Williams disputes he had any of these difficulties and claims that he "numerically passed this check ride based on AQP Difficulty Equivalency." Dkt. #99 at 20. Mr. Williams also points out that the check ride was not recorded and Captain Wood's score sheet was "somehow" lost. *Id.* at 12, ¶ R.

After a final review panel convened on March 10, 2016 to decide Mr. Williams's future with United, Mr. Williams was given another opportunity to complete the training. Dkt. #86 at 12, ¶ 30. He had two additional warm-up sessions, the last with First Officer Renfro, who then recommended a second check ride. The evaluator this time was Captain Mark Rosenhahn, a United employee since July 1989, with First Officer Renfro serving as the captain seat-fill. Dkt. #86 at 10, ¶¶ 22–24.

Mr. Williams arguably fared worse on his second check ride. In his Additional Training Report, Captain Rosenhahn noted, among other things, that Mr. Williams:

- Had difficulties locating and completing the appropriate checklist items prior to takeoff;

- Had difficulty locating airways for re-route;

- While taking an "extended time to load box," did not monitor other pilot when he went below "bottom altitude," resulting in an "altitude bust"; and

- Descended on approach below minimums with no runway in sight before finally executing a "go-around."

Dkt. #86-29 at 2. Due to these issues, especially Mr. Williams' "flying in on an approach below minimums with the runway not in sight," Captain Rosenhahn failed Mr. Williams. Dkt. #86 at 13–14, ¶ 34. According to Captain Wood, descending below minimums is "the biggest no-go in our industry" and would, in and of itself, justify failing a prospective pilot on a check ride. Dkt. # 86-26 at 5–6.

For his part, Mr. Williams describes going below minimums as "deadly." Dkt. #86 at 14, ¶ 36. However, he denies ever doing so and blamed most of the problems during the second check ride on First Officer Renfro. Dkt. #99 at 13–15, ¶ T. Mr. Williams

maintains that he followed appropriate procedures, and identifies several alleged irregularities in the evaluation, including First Officer Renfro not attending the check ride briefing and Captain Rosenhahn informing him that the FAA was going to send a representative to watch the evaluation, which Mr. Williams states is highly unusual. *Id.* He believes that Captain Rosenhahn's and First Officer Renfro's contemporaneous reports as to what happened on the second check ride "were the subject of fabrication and/or inappropriate corroboration." *Id.* at 21.

Following the second failed check ride, another final review panel was held on March 21, 2016. Dkt. #86 at 16, ¶ 38. During that conference, it was determined that "no further training would be offered," and Mr. Williams was ultimately given the choice to resign or be terminated. *Id.*, ¶ 40. He chose termination. *Id.*

Captain Mike McCasky, United's Managing Director of Flight Training, testified that he was not aware of any other probationary pilot who failed two or more check rides and was given an option to resign rather than having his or her employment terminated, and United contends that three failed check rides could result in the FAA directly intervening and potentially removing a pilot's license. *Id.* at 17, ¶ 41. Finally, between 2015 and early 2017, five probationary pilots were separated due to performance difficulties in training; two were black (including Mr. Williams), and three were white. *Id.* at 19, ¶ 51.

## II. STANDARD OF REVIEW

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories,

admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). S*ee also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings

themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998)

(quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must

be generally admissible and . . . if that evidence is presented in the form of an affidavit,

the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the

evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432

F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences

in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of

Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## III. ANALYSIS

### A. Discrimination Claims

On summary judgment, racial discrimination claims brought under Title VII,

section 1981, and CADA are all analyzed under the burden-shifting framework

enumerated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Carney v.

City & Cty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (section 1981 claim for

employment discrimination based on race involves the same analysis as those brought

under Title VII); *Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1253–54 (Colo. 2001)

(likewise for CADA claims). The Court analyzes these claims according to the principles

set forth below.

First, Mr. Williams bears the burden to set forth a prima facie case for

discrimination. *See Young v. United Parcel Serv.*, Inc., —— U.S. ——, 135 S. Ct. 1338,

1353–54 (2015); *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th

Cir. 2015). He must show he: (1) belongs to some protected class, (2) was qualified for

the position at issue, (3) suffered an adverse employment action, and (4) was treated

less favorably than others. S*ee Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006). If Mr. Williams establishes a prima facie case of discrimination, the burden shifts to United to articulate a legitimate, nondiscriminatory reason for the adverse action. *Bennett*, 792 F.3d at 1266. The burden then returns to Mr. Williams to demonstrate pretext—that is, to show that the employer's proffered reason is untrue and that prohibited discrimination is the true reason for the adverse action. *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010). Importantly, at the summary judgment stage, "a plaintiff generally need not provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered explanation is pretextual." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) ("The plaintiff need not show both that the defendant's reasons were a pretext and that the real reason was discrimination—the fact of pretext alone may allow the inference of discrimination.") (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135–36 (10th Cir. 2003)). *See also Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008) ("To defeat . . . summary judgment, 'the plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief.'") (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1321 (10th Cir.1997)).

For purposes of ruling on United's summary judgment motion, the Court will assume without deciding that Mr. Williams has established a prima facie case of discrimination: that he belongs to a protected class; that he was qualified for the position; that he suffered and adverse employment actions; and that he was treated less favorably than others who were similarly situated. *See Belgasem v. Water Pik Techs.,*

12

*Inc.,* 457 F. Supp. 2d 1205, 1213 (D. Colo. 2006) (where Judge Babcock did the same). The Court also finds that United has proffered a proffer a legitimate, non-discriminatory reason for terminating Mr. Williams' employment; namely, his inability to pass two FAA-administered check rides even after receiving five additional training sessions. Thus, the Court proceeds to pretext.

To establish pretext, an employee must point to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *PacifiCorp*, 524 F.3d at 1158 (quoting *Morgan*, 108 F.3d at 1323). "When assessing whether [a] plaintiff has made an appropriate showing of pretext, [the Court] must consider the evidence as a whole." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002). Although a plaintiff is not limited in his mode of proving pretext, there are two "typical" methods: (1) direct evidence that the stated reason for the adverse employment action is false; or (2) evidence that the employer treated the plaintiff differently from other similarly-situated employees who violated work rules of comparable seriousness. *Swackhammer*, 493 F.3d at 1167. Disparate treatment of similar employees is "especially relevant" in the pretext inquiry. *PacifiCorp*, 524 F.3d at 1158.

The Court finds that Mr. Williams has not presented facts that raise a genuine issue that his termination was pretextual. First, the actions of First Officer Taylor, on which Mr. Williams heavily relies, are largely irrelevant to Court's analysis. The Court will accept as true that Mr. Taylor offered Mr. Williams a watermelon Slurpee, told him

that three of the four people to fail training and be fired "were Hispanic with accents," unfairly criticized him during training, and gossiped about him to other instructors. However, is undisputed that Mr. Williams *passed* the portion of training supervised by First Officer Taylor. In short, there is no evidence that Mr. Taylor made any discriminatory decisions adversely affecting Mr. Williams' employment prospects.

Moreover, while it may be possible to infer that First Officer Taylor spread "the dirty low down about him" to First Officers Halloran and Ziegler, neither of these individuals were involved in the failed check rides. First Officer Halloran was merely paired with Mr. Williams during his final procedures validation training. Mr. Williams complains that First Officer Ziegler recommended that he complete additional, unnecessary FFS rides during the LOFT phase. Although he may think this decision was "preposterous," Mr. Williams offers no evidence that it was in any way pretextual. Indeed, it is difficult to see how, under any circumstance, the requirement that Mr. Williams complete *more* training, even if that training was functionally useless, could be linked to Mr. Williams' failure to pass the check rides. And even if the Court were to accept Mr. Williams' thinly-supported assertion that First Officer Ziegler "made up" the reasons to recommend extra training, it is undisputed that Mr. Williams *passed* LOFT and was able to proceed to the final portion of the probationary training: the check ride.

Mr. Williams argues that United deviating from its policies and practices by separating him from his training partner, Captain Davis; not sharing alleged problems during debriefings; and convening panels to decide his fate without including him or "providing any objective evidence for the panel members" are also evidence of pretext. However, United articulated a legitimate reason to separate Mr. Williams and Captain

14

Davis: Captain Davis was ready to advance to the check ride while Mr. Williams needed more work. While discouraged, this type of separation was allowed by United's AQP, as was pairing Mr. Williams with an instructor during the check rides. Again, Mr. Williams' disagreement over the propriety and necessity of these actions does not create a triable issue of fact. Additionally, Mr. Williams offers no evidence that the review panels deviated from any policy and, even if they did, that deviation alone is not enough to establish pretext. *See Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual."). There is no evidence of any racially-motivated bias in connection with these decisions.

Turning to the events that actually led to Mr. Williams' termination—the failure to pass two check rides—the Court must examine the facts "as they appear to the person making the decision to terminate [the] plaintiff." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000). Mr. Williams does not point to any evidence of racially-charged comments or actions by the United employees involved in the check rides themselves, or by those who made the decision to terminate Mr. Williams when he failed to pass the evaluations. There is no evidence—only conjecture and rank speculation—that Captains Wood or Rosenhahn, who oversaw the evaluations, were aware of First Officer Taylor's prior remarks to, and allegedly malicious gossip about, Mr. Williams, which constitutes (along with the "gentle giant" remark) the only evidence that can even verge upon being labelled as discriminatory. Though Mr. Williams

vigorously disputes that he did anything to earn failing marks during either check ride, he offers no rebutting evidence that Captains Wood or Rosenhahn were not honest in their assessments of his performance.[4] *See Babbar v. Ebadi*, 216 F.3d 1086 (10th Cir. 2000) ("The relevant inquiry in a . . . discrimination action is not whether [the defendant's] proffered reasons were wise, fair or correct, but whether [the defendant] honestly believed those reasons and acted in good faith on that belief.") (citation and quotation marks omitted). Similarly, there is no evidence that United management relied on anything but Mr. Williams' repeated failure to pass a mandatory examination when making its decision to terminate his employment, or that that reliance was in bad faith.

Mr. Williams other arguments as to why United's actions were pretextual are also unavailing for the following reasons:

- United adequately explained why data for Mr. Williams' check rides was not available. Dkt. #103 at 31.

- Mr. Williams does not deny that Captain Wood failed him on the first check ride; a missing score sheet, even if it "admittedly critical to determining if someone passed or failed," does not change this fact.

- Captain Rosenhahn provided unrebutted testimony that he asked FAA representatives to not observe the second check ride because doing so would increase the pressure on Mr. Williams, but agreed to let them be involved in the debriefing (they chose not to). Dkt. #103 at 12. Rather than exhibiting any degree

---

[4] Mr. Williams' allegation that Captain Rosenhahn and First Officer Renfro "fabricated" their reports regarding the second check ride is entirely unconvincing and unsubstantiated.

of discriminatory animus, this demonstrates a not-insignificant amount of solicitude towards Mr. Williams.

- Captain Rosenhahn held both First Officer Renfro and Mr. Williams accountable for mistakes made during the second check ride; Mr. Williams was not singled out for criticism.

- Mr. Williams cites no evidence for his claim that United revised its Pilot Proficiency Policy "to retroactively justify the actions it took to terminate Plaintiff's and others' employment."

- Mr. Williams' citation to employment statistics on United's probationary pilots does not contradict United's evidence that Mr. Williams' employment ended because he failed two check rides.

- Even if the Court credits the irregularities Mr. Williams describes surrounding the second check ride, none relate in any way to Mr. Williams' race or national origin. For example, it is difficult, if not impossible, to see how Captain Rosenhahn's failure to observe standard operating procedure during the second ride check is, as Mr. Williams argues, "possible direct evidence of discrimination," when Captain Rosenhahn is not alleged to have made any direct (or indirect, for that matter) reference to Mr. Williams' race or country of birth.

Nor has Mr. Williams shown that he was treated differently than others who were similarly situated. Individuals are considered "similarly situated" when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of "comparable seriousness." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir.2006) (analyzing whether

employee was "similarly situated" in Title VII race discrimination case); *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir.2004) (applying this "similarly situated" test to §§ 1981 and 1983 claims); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir.1991) ("[T]he elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII.").

Mr. Williams offers no evidence that any probationary pilot, white or black, retained their employment with United after failing two or more check rides. Mr. Williams also admits that he was the only was the only person fired from his class of 22 trainees, a class that contained at least two other black pilots. Moreover, between 2015 and early 2017, three of the five probationary pilots who were terminated due to performance difficulties in training were white; the other two, including Mr. Williams, were black. No inference of discrimination can be gleaned from these statistics.

Despite his claims to the contrary, Mr. Williams was not similarly situated to his original training partner because Cliff Davis was a Captain, not a First Officer, and his training differed from Mr. Williams'. *See* Dkt. #103 at 20–21, ¶ D. Mr. Williams argues that the affidavit of former United pilot Michael Kabbah shows that United treats black trainees different from white ones by separating black pilots from their training partners. *See* Dkt. #99-4. However, Mr. Kabbah's Declaration does not indicate that the same decisionmakers were involved in his training.[5] Moreover, Mr. Kabbah was terminated

---

[5] Although Mr. Kabbah states he spoke with Mr. Strickland several times, it is unclear what type of authority Mr. Strickland over crew makeup. Mr. Kabbah also mentions that he had warm-up sessions with First Officer Ziegler but does not allege that First Officer Ziegler made any adverse decisions regarding his training.

prior to ever attempting a check ride, which means he was not subjected to the same performance evaluation as Mr. Williams.

In sum, there is no genuine dispute of material fact as to whether United's proffered reason for firing Mr. Williams was so unworthy of belief that a reasonable factfinder could rationally infer that it did not act for the asserted non-discriminatory reasons. Mr. Williams summarizes his grievances as follows:

> [T]he evidence shows that United instructors were consistently condescending toward Plaintiff, assigning him meaningless tasks, hid, destroyed or otherwise failed to create or access information that would have verified their claims that he needed more training or failed either check ride, what he did to fail the check rides, what his score was on the first check ride and how that constitutes failing it, and most significantly, whether any of the claimed factual events that were the cause of the either check ride failure actually happened[.]

Dkt. #108 at 6. Mr. Williams may certainly feel that his supervisors were unfair, non-responsive, or unprofessional, but this Court does not sit as a "super-personnel department," interjecting its own opinions as to how a supervisor should have responded to a given incident or second guessing the business judgment of the employer. *Dewitt v. Southwestern Bell Telephone Co.*, 845 F.3d 1299, 1307-08 (10th Cir. 2017). Mr. Williams has failed to provide any evidence that United's decision to terminate him after failing two check rides was merely a pretext for racial or national origin discrimination. Accordingly, summary judgment should enter in favor of United on Mr. Williams discrimination claims.

**B. Retaliation Claim**

To state a prima facie case of retaliation, Mr. Williams must show that: (1) he engaged in a protected activity; (2) United took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between

the protected activity and the adverse action. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (footnote omitted).

It is unclear from Mr. Williams' deposition testimony as to whether he informed United management–specifically, Mr. Strickland–about the perceived discrimination he encountered from First Officer Taylor.[6] *Compare* Dkt. #99-6 at 65–66 (Mr. Williams did not tell Mr. Strickland or anyone else in United management about the Slurpee incident), *with id.* at 37 (Mr. Williams states he reached out to Mr. Strickland and "explained everything to him with respect to what was said to me in the briefing room in front of Mr. Davis."). The Court will assume that he did engage in a protected activity, and it is undisputed that United took a materially adverse action when Mr. Williams was terminated.[7] However, there is no evidence of a causal connection between the two events. Mr. Williams contends that he "can establish a causal connection" because "after he reported Taylor's statements and conduct to Strickland, the pressure on him intensified as Strickland continued to spread misinformation about Plaintiff to the instructor team via electronic mail, and otherwise." Dkt. #99 at 34. First, as United notes, "intensifying the pressure" on a trainee is not an adverse employment action. Furthermore, Mr. Williams alleges that Mr. Taylor, not Mr. Strickland, spread the harmful gossip that "colored" his remaining training. Insofar as Mr. Williams relies on Mr. Strickland's email to First Officer Mauch as evidence of retaliation, there is nothing in

---

[6] While Mr. Williams testified that Captain Davis also made derogatory comments about him, he concedes that he did not complain to anyone at United about it. Dkt. #99-6 at 32–33.

[7] Mr. Williams states that being separated from his training partner was also an adverse action. However, he does not offer any facts to establish that Mr. Strickland had anything to do with that decision.

that communication that can be construed as discriminatory. Mr. Strickland is merely relaying that Mr. Williams is "experiencing difficulty communicating under stress," which is consistent with First Officer Taylor's commentary, and asks for assistance in helping Mr. Williams make progress in this area. First Officer Mauch agreed. There is nothing that links this email with the failed check rides, which occurred over a month after the email was sent, and after Mr. Williams passed the intervening training modules.

Because Mr. Williams cannot make a prima facie showing of any causal relationship between him allegedly complaining about First Officer Taylor's discriminatory actions and his termination, United is entitled to summary judgment on the retaliation claims.

### C. Hostile Work Environment Claim

An employer may not discriminate against an employee by allowing "a hostile work environment based on race or national origin discrimination." *Al–Kazaz v. Unitherm Food Sys., Inc.*, 594 F. App'x 460, 462 (10th Cir. 2014) (citing *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012)). The parties agree that "[t]he question is whether a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1327 (10th Cir. 2004). A claim for hostile work environment requires facts showing that the work environment "is both subjectively and objectively hostile or abusive." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) (internal quotation marks and brackets omitted). To meet the objective portion of this test, the alleged harassment must "be of the character that it

would be deemed hostile by a reasonable employee under the same or similar circumstances." *Id.* "A hostile work environment claim must be based on severe and pervasive discriminatory intimidation or insult." *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003). "[P]ervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish an objectively hostile or abusive work environment, though these two grounds "are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (quotation marks and ellipses omitted). The Court considers the totality of the circumstances in determining whether a work environment is hostile or abusive, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *accord Lounds*, 812 F.3d at 1222. "One of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere . . .—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412–13 (10th Cir. 1987) (citations omitted).

Here, the Court can identify three potentially hostile or abusive acts: First Officer Taylor offering Mr. Williams a watermelon Slurpee; First Officer Taylor telling Mr. Williams that three out of the four past trainees who were terminated were Hispanic and spoke with heavy accents; and First Officer Halloran calling Mr. Williams "gentle giant." "[I]n establishing a hostile-work-environment claim, plaintiffs must do more than point to

'sporadic racial slurs'; they must present evidence of 'a steady barrage of opprobrious racial comments.'" *Young v. City of Idabel*, 721 F. App'x 789, 801 (10th Cir. 2018) (quoting *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)). The isolated, non-pervasive incidents described by Mr. Williams do not satisfy the objective prong of the Court's hostile work environment analysis. *See Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) ("A plaintiff does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents[.]"). *Cf. Walker v. United Parcel Serv.,* 76 F. App'x 881, 887 (10th Cir. 2003) (eight incidents over eight-month period sufficiently pervasive to create objectively hostile work environment). Nor, as a matter of law, are they sufficiently egregious. *See, e.g., Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 433 (6th Cir. 2014) (finding comments about fried chicken and watermelon insufficient). *Cf. Tademy*, 614 F.3d 1145 (holding that a reasonable jury could find that racist graffiti and cartoons "combined with the words 'nigger' and 'nigger go home' etched on [the plaintiff's] locker are the sort of conduct that would make any reasonable person feel uncomfortable—and entirely unwelcome, to say the least—in the workplace."). Finally, because it is undisputed that Mr. Williams passed the training supervised by First Officer Taylor, "the harassment did not affect a term or condition of [Mr. Williams'] employment," *Cooper v. Am. Airlines, Inc.*, 213 F. App'x 714, 717 (10th Cir. 2007), as is required to prove a such a claim.

For these reasons, Mr. Williams' evidence, viewed in the light most favorable to him, is insufficient to permit a reasonable jury to find that he was subjected to harassment based on race or national origin that was so severe or pervasive as to have

altered the conditions of his employment and have created an abusive working environment.

## IV. RECOMMENDATION

It is hereby **RECOMMENDED** that Defendant United Airlines, Inc.'s Partial Motion for Summary Judgment (Dkt. #68) be **GRANTED**.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives de novo review of the recommendation by the District Judge, *Thomas v. Arn*, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions, *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated:     October 8, 2019
              Denver, Colorado

N. Reid Neureiter
United States Magistrate Judge